## SAMS, Appellant, v. ST. LOUIS & MERAMEC RIVER RAILROAD COMPANY.

### In Banc, April 1, 1903.

1. Negligence: FELLOW-SERVANTS: CAR-STARTER AND MOTORNEER: VICE-PRINCIPAL. The evidence tended to show that the car-starter had authority to direct the conductor and motorneer when to start after their car had reached its down-town terminus, and that his authority to regulate intervals between the cars applied not only to starting them at this terminus; but extended all along the line and that in that matter the motorneer and conductor were ordered to obey him. While the conductor was reversing the trolley at this terminus the car-starter, not noticing this act of the conductor, but observing that the car had not quite cleared the switch by which it got on the other track to return in the direction from which it came,

directed the motorneer to move up, and the motorneer set the apparatus to receive the electric current, but the car did not move owing to the fact (which neither he nor the car-starter had noticed), that the conductor, on the other side of the car, was reversing the trolley. Thereupon the motorneer took off the controller, leaving the apparatus open to receive the current, and started to the other end of the car where he had to stand on his return trip, and on the instant the trolley touched the wire, the car shot forward and injured the conductor, the injury being due to the negligent act of the motorneer in removing the controller and starting to the other end of the car without closing the apparatus. *Held,* that the order of the car-starter was for the motorneer to move the car in a proper way, and not to remove the controller and attempt to start it until the trolley was readjusted, and therefore the motorneer's negligence was not the act of the car-starter, and hence the plaintiff can not recover on the theory that the car-starter was a vice-principal, but if at all, only on the theory that the conductor and motorneer were fellow-servants.

2. ———: EXTENT OF FELLOW-SERVANT LAW: STREET RAILWAYS ORGANIZED AS RAILROADS. The fellow-servant statute does not impose its liabilities on railroad corporations because they are organized as such, nor does it apply to them without reference to the business in which they are in fact engaged, nor to their employees in every capacity. It only imposes on companies that own and operate railroads liability for damages sustained by a servant engaged in the work of operating a railroad.

3. ———: ———: STREET RAILWAY: WHERE CHARTERED AS RAILROAD. The liabilities for injuries to fellow-servants imposed by the Fellow-Servant statute can not be imposed on a company chartered as a railroad which in fact is engaged in operating a street railway. In such case the inquiry is, not what business was the company authorized by its charter to do, but what in fact was its business and in what work was its injured servant engaged?

4. ———: ———: ———: UNIFORMITY OF LIABILITY. Where there are two concerns engaged in precisely the same business, and both conducting it in precisely the same manner, a statute which would undertake to impose a liability on the one and not on the other, could not be sustained in the face of either the State or Federal Constitution.

5. ———: ———: THE WORD "RAILROAD." The word "railroad" used in the statutes may or may not apply to a street railway, and to determine whether or not it does, the connection in which it is used must be looked to.

6. Laws Applicable to a Class: NATURE OF BUSINESS: FELLOW-SERVANT ACT. The constitutionality of the Fellow-Servant act rests.

on narrow grounds, since it is an act of class legislation that marks off certain employers of men and imposes on them a liability for injuries to their servants under certain circumstances which is not imposed on other masters, and in order to justify such class distinction the courts will look into the nature of the business in which the employer of the person invoking that law is engaged and ascertain what it is that justifies the act, and what object the Legislature had in view in enacting it, and if they find that such business (for instance, a street railway) is of the nature, and the men engaged therein are within the class intended by the Legislature, they will permit one of its servants who has been injured by the negligence of a fellow-servant to recover for his injuries from their common master.

7. ———: ———: ———: HAZARD. It is not merely the degree of the hazard to which employees engaged in operating steam railroads are subjected that justifies the Fellow-Servant act, but the peculiar nature of the hazard incident to the business.

8. Fellow-Servant Act: NOT APPLICABLE TO STREET RAILWAYS. The Fellow-Servant Act of 1897 does not apply to street railroads.

9. ———: ———: RAILROAD: MEANING IN STATUTE. In almost every instance where street railroads are intended in our statutes, street railroads are named, and in every instance where commercial railroads are intended the word railroad only is used.

PER GANTT, J., DISSENTING; BURGESS AND BRACE, JJ., CONCURRING WITH HIM.

1. Fellow-Servant Act: INCLUSIVE OF TERMS USED. The words "every railroad corporation" used in the Fellow-Servant statute of Missouri are broad enough in themselves to include street and electric railroads, and, therefore, prima facie they apply to street as well as to any other railroads.

2. ———: ———: STATUTORY CONSTRUCTION. Where a law is clearly expressed it is the duty of the courts to adhere to the literal expression unless such construction would lead to a palpable absurdity.

3. ———: ———: ———: USE OF WORD "RAILROAD." It is not accurate to state that the word "railroad" where used in our statutes always refers to steam railroads, and that when street railroads are to be included they are specifically named as such; on the contrary, if the context contains no such contrary indication, a statute containing the word "railroad" should be held to include every species of railroad.

4. ———: ———: ———: ———: REMEDIAL STATUTE. The universal rule is that a remedial statute should receive a liberal construction,

to cure the evils which it was intended to remedy. And such was the Fellow-Servant statute of 1897, and therefore the words "every railroad corporation" therein should not be restricted to mean simply steam railroads.

5. ———: ———: ———: ———: ———: REASON FOR LAW. Prior to the enactment of the Fellow-Servant law the decisions of this court had been that a master was not liable to his servants for injuries occasioned by the negligence of a fellow-servant, and those decisions led to the enactment of that statute.

6. ———: ———: REASON FOR: CLOSE ASSOCIATION OF EMPLOYEES. The close association of employees on a street railway, and the inability of the large number of employees of a steam railroad to watch the movements of each other, do not afford any sufficient reason for holding that the Fellow-Servant act does not apply to street railways, because there is no such exception written in the law, and there is no such difference in this regard as to clearly distinguish the business of the two kinds of railroads.

7. ———: ———: RISE OF CABLE AND ELECTRIC RAILWAYS: MINNESOTA LAW. The decision of the Minnesota Supreme Court, holding that the Fellow-Servant law of that State does not apply to street railways, can have no force in interpreting the Missouri statute of 1897, for when the Minnesota statute was passed in 1887 "there were no cable or electric street railways in existence in Minnesota," and the decision of that court is expressly based on the charge that the Legislature of Minnesota legislated in ignorance of the character of such roads.

8. ———: ———: CONSTITUTIONALITY: CLASS LEGISLATION. If the contention that the Fellow-Servant law is unconstitutional as class legislation when applied to street railways unless they fall within the reason of the statute, is sound, then it must result that it would not be within the power of the Legislature, even by the use of the words "street railways" to make them amenable to the provisions of the statute. But there are not any such peculiar hazards attending the operation of steam railroads as bring their employees into a constitutional class to themselves. It would be competent for the Legislature to enact a fellow-servant law, applicable not only to all employees of railroads, but to all masters and servants.

9. ———: ———: UNCONSTITUTIONALITY MUST BE MANIFEST. An act of the Legislature is not to be declared void unless its violation of the Constitution is so manifest as to leave no room for doubt.

10. ———: ———: APPLICABLE TO STREET RAILWAYS. The Fellow-Servant law of 1897 made street railways liable in the same manner as steam railroads are to their employees for the negligence of fellow-servants.

11. ——: ——: ——: STREET RAILWAYS CHARTERED AS STEAM RAILROADS. Even though the words "every railroad corporation" used in the Fellow-Servant law of 1897 be held not to include street railway companies, nevertheless it applies to a company incorporated for the purpose of constructing, maintaining and operating a standard gauge railroad for public use in the carriage of persons and property, and constructed from a point in a city through several suburban towns to a resort in the country, with power in its charter to exercise the power of eminent domain in condemning a right of way, although its motive power is wholly electricity. By electing to take its charter under the general railroad law it voluntarily placed itself in the class to which the Act of 1897 necessarily applies. Nor is its character changed from a general to a street railroad by the fact that for the most of its line it carries only passengers, and only for a part of the distance mail and express.

12. ——: ——: ——: MOTIVE POWER. The motive power used in propelling the cars is not a determining feature in distinguishing a street railway from a general railroad which carries both freight and passengers.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferris,* Judge.

AFFIRMED.

*C. A. Schnake* and *O. J. & R. Lee Mudd* for appellant.

·(1) Horn was negligent in not keeping the car free from contact with the electric current while plaintiff was reversing and readjusting the trolley pole, and this negligence caused plaintiff's injuries. (2) The defendant was and is liable to plaintiff for Horn's negligence. Act of 1897, Laws 1897, p. 96. (3) Hogan was guilty of negligence in causing plaintiff's injuries. At least this issue should have been submitted to the jury. (4) Hogan was vice-principal, and defendant is liable to plaintiff for his negligence. Laws 1897, p. 96, sec. 2; Smith v. Railroad, 92 Mo. 359.

*McKeighan & Watts* and *Robt. A. Holland, Jr.,* for respondent.

(1) The conductor and motorman of a street car

are fellow-servants, and neither can recover for injuries resulting from the negligence of the other, while engaged in the operation of the car; and the plaintiff so states in his assignment of error that the conductor and motorneer are fellow-servants. (2) The Act of 1897, commonly known as the Fellow-Servant Act, does not apply to street railroads. Funk, Admx., v. Railroad, 61 Minn. 435; Railroad v. Johnson, 2 Wash. 112; Railroad v. Railroad, 2 Duv. 175; Manhattan Trust Co. v. Railroad, 68 Fed. 82; Byrne v. Railroad, 61 Fed. 605; Sears v. Railroad, 65 Iowa 742; Mass. L. & T. Co. v. Hamilton, 11 A. & E. R. R. Cases (N. S.) 771; Booth, Street Railroads, 2; Thomson-Houston Electric Co. v. Simon, 20 Ore. 60; Nichols v. Railroad, 87 Mich. 361. (3) Hogan was not a vice-principal, certainly not with respect to the duties that he performed as a "starter" at Sixth and Locust streets. Grattis v. Railroad, 153 Mo. 380; Murray v. Railroad, 98 Mo. 573; Garland v. Railroad, 85 Mo. App. 579. There was no causal connection between the direction given by Hogan and the injuries received by plaintiff. Goodrich v. Railroad, 152 Mo. 222; Graney v. Railroad, 57 S. W. 276.

*O. J. Mudd* for appellant in reply.

(1) The Fellow-Servant Act applies to street railroads. St. Louis Bolt & Iron Co. v. Donohoe, 3 Mo. App. 559; Koken Iron Works v. Railroad, 141 Mo. 228. (2) But if the Fellow-Servant Act is not applicable to "street" railroads, respondent is not a "street" railroad, but is a "railroad corporation owning and operating a railroad in this State." Booth on Street Railroads, sec. 1, p. 2; Ruckert v. Railroad, 63 S. W. 118; Williams v. Railroad, 41 Fed. 556; 2 Beach on Priv. Cor., sec. 403, pp, 664, 665; Railroad v. City of Kirkwood, 159 Mo. 239; St. Louis Bolt & Iron Co. v. Donohoe, supra; Manhattan Trust Co. v. Rail-

road, 68 Fed. 82; Powell v. Sherwood, 63 S. W. 485; Funk v. Railroad, 61 Minn. 435; Thompson-Houston Elec. Co. v. Simon, 20 Ore. 60. (3) Respondent is not in a position to question that both by its charter and usage it is a carrier of freight. How much or how little freight it has carried is wholly a matter of its own discretion, and is not material as to this controversy. (4) The existence, genus, species, individuality, privileges, powers, duties and liabilities of this respondent all depend upon the legislative act which gave it birth, and not upon its own voluntary action or non-action. Railroad v. Canal Cons., 21 Pa. St. 9; Millvale v. Railroad, 131 Pa. St. 1. (5) Respondent may not incorporate under a law, take caste or color from the law, avail itself of its benefits, but relieve itself of its burdens. Railroad v. Kirkwood, 159 Mo. 254. (6) "A railroad company can not be incorporated under article 2, chapter 42, Revised Statutes 1889, except for the purpose of constructing, maintaining and operating a railroad for public use in the conveyance of persons and property." Railroad v. Kirkwood, 159 Mo. 241. (7) "But a corporation can not bind itself to exercise only part of the franchise committed to it by the State for public purposes, or make a valid contract not to exercise part of the franchise committed to it by the State for public purposes." Railroad v. Kirkwood, 159 Mo. 242. (8) How, then, can respondent be heard to say: True, the law which gave me birth and whence I take caste and color, would impose upon me the liabilities of "a railroad corporation," but I only use a portion of my charter powers, and hence escape the burdens incident to my parentage. (9) If respondent "is a railroad in this State" it must submit to the terms of the Fellow-Servant Act. The fact that it comes down into the city on what might be called "street railway tracks" will not make it governed by one law at one end and by another law at the other end. R. S. 1899, sec. 1163; Id. 1889, sec. 2666.

VALLIANT, J.—Suit for damages for personal injuries.

The petition states that the defendant is a railroad corporation owning and operating a railroad from a point named in the city of St. Louis to a point named in St. Louis county, and is engaged in carrying passengers and freight, by means of cars propelled by steam and electricity; that on each car the defendant has two employees, a motorneer whose station is on the front platform where he manipulates the machinery through which the electric power is applied, and a conductor who has certain other duties to perform. There was also at the time and place of the accident a third employee of the defendant, whom the plaintiff calls a car dispatcher, whose station was at the eastern terminus of the road, who had authority to direct the movements of the car and to command the motorneer and conductor in reference thereto; that upon the occasion in question the plaintiff was the conductor on one of these cars, one Horn was the motorneer, and Hogan the car dispatcher; that Horn was without skill or training; that on January 27, 1898, at the eastern terminus of the road at Sixth and Locust streets in St. Louis, while the plaintiff in the due discharge of his duties as conductor was on the ground in front of the car, in the act of shifting the trolley to reverse the direction, the car, through the negligence and lack of skill of the motorneer and the negligence of the car dispatcher, was suddenly projected against the plaintiff, crushing him against another car which was standing on the track and inflicting on him great bodily injuries. Specifications of the conduct of the motorneer and car dispatcher constituting the alleged negligence are set out in the petition, as likewise are the particulars of the injuries suffered by the plaintiff.

The answer was a general denial, contributory negligence of the plaintiff, and a special plea that defendant was a street railroad corporation organized

for the purpose and engaged in the business only of conducting a street railroad, that the plaintiff, the motorneer and the car dispatcher were fellow-servants employed in operating the car, and therefore defendant was not liable to plaintiff for the negligence of his fellow-servants.

The reply was a general denial.

On the trial plaintiff introduced in evidence the charter of the defendant; by which it appeared that defendant was incorporated as an ordinary railroad company under article 2, chapter 42, Revised Statutes 1889 (now chap. 12, R. S. 1899), also evidence showing that it had claimed and exercised the right of eminent domain to condemn private property for a part of its right of way outside of the city, that its road in the city was in the city streets and of the same character as ordinary street railroads, whilst in the country it was partly of that character and partly of the character of the ordinary steam railroads; that the cars of defendant were moved by electricity under the ordinary trolley system and for the carrying of passengers only, except that defendant had one car, propelled in like manner as its passenger cars, which was used to carry the United States mails, and one-half of it was arranged to carry freight, or express packages and was so used; that from its eastern terminus at Sixth street, west to Forty-first street, the road was used jointly for the same purpose by defendant and a street railway company called in the evidence, The Suburban.

The car on which plaintiff was conductor was an ordinary street car and was being used as such like the cars of the Suburban company operating over the same road, only the defendant's car was red and the Suburban's yellow. There was evidence tending to show that Hogan, the car starter, had authority to direct the conductor and motorneer when to start, and that his authority to regulate the time space between

cars applied not only to the starting at the eastern ter-
minus but extending all along the line, and that in that
matter the conductors and motorneer were ordered
to obey him; that if his orders were disobeyed he
would report the offender who was therefor liable
to be suspended. There was no evidence to support
the charge that the motorneer was inexperienced or
deficient in skill. The evidence as to the accident
tended to show, as follows:

The road was a double track, ending at Sixth
street on Locust. The mode of operating was, the
cars would come east on the south track, the machinery
would be reversed without turning the cars, and they
would be passed over a switch to the north track, on
which they would return west. The car came in a lit-
tle late, and Hogan, the car-starter, spoke angrily to
the motorneer, asking him where he had been. The
car stopped, the conductor stepped off to reverse the
trolley, passing on the south side holding the cord.
Hogan was standing on the north side, and, seeing that
the rear trucks of the car had not cleared the switch,
motioned or called to the motorneer to move up. The
motorneer as if in obedience to that direction set the
apparatus to receive the electric current but the car did
not move, owing to the fact (which neither the motor-
neer nor Hogan seemed to have noticed) that at that
moment the conductor was in the act of reversing the
trolley, and therefore the connection of the machinery
with the wire overhead was broken. The motorneer,
still seeming not to see what the conductor was doing,
took off the controller, leaving the apparatus open
to receive the current, and started to the other end of
the car where he was to stand when going west. His
duty under the circumstances was to have closed the
machine against the admission of the current until the
conductor had readjusted the trolley, but this he neg-
lected to do, and on the instant the trolley touched the
wire the car shot forward and crushed the plaintiff

against one of the Suburban cars which was standing on the track and inflicted on him great injuries.

At the close of the plaintiff's evidence the court at the request of the defendant gave an instruction to the effect that the plaintiff was not entitled to recover. Thereupon he took a nonsuit with leave, and his motion to set the same aside having been overruled, he brings this appeal.

## I.

There is nothing in the case to justify a conclusion that the car-starter was a vice-principal of the defendant. He had a certain duty to perform, and in that his word was the word of the master to his fellow-servants, and if they refused to obey him in that particular they were, on being reported to the manager, liable to be suspended. But each of the other servants had his peculiar duty to perform and in which his word was' that of the master. The conductor by word or signal to the motorneer orders him to start or stop the car, and if he should refuse to obey and the fact was reported to the manager, doubtless he would be disciplined. And there may be events in the operation of the car when the motorneer may be in duty bound to give orders to the conductor which he is to obey. But it would never be contended that the conductor and motorneer were not fellow servants. And so, is a car-starter who has no more authority than this man had, the fellow servant of the conductor and motorneer. Although the motorneer in seeming obedience to the order of the car starter did a negligent act, yet the car-starter did not order him to do what he did. The order was to move the car forward so as to clear the switch. That was a proper thing to do and could have been done in a proper manner. The argument is made that the order should not have been given at the instant the conductor was in the act of readjusting the

trolley. Assuming as we should, that the car-starter saw what the conductor was doing when he gave the order, still the order did not mean that the motorneer should move the car with the trolley off, which would have been impossible, but that he should do it in a proper way. The negligence was in the act of the motorneer attempting to execute the orders without looking to see what the conductor was doing, and in removing the controller and starting to the other end of the car without closing the apparatus against the current which he was bound to know would pass into the machinery as soon as the trolley should touch the wire. We do not perceive any negligence in the act of the car-starter, but undoubtedly the act of the motorneer was negligence, and if the defendant is liable to the plaintiff for the negligence of his fellow-servant, the trial court erred in giving the instruction which forced the nonsuit. This brings us to the main question in the case.

## II.

The General Assembly passed an act which was approved February 9, 1897, the first section of which, being now section 2873, Revised Statutes 1899, is, "Every railroad corporation owning or operating a railroad in this State shall be liable for all damages sustained by any agent or servant thereof while engaged in the work of operating such railroad by reason of the negligence of any other agent or servant thereof: Provided, that it may be shown in defense that the person injured was guilty of negligence contributing as a proximate cause to produce the injury."

The question is, does that statute apply to the defendant which claims to be a corporation owning or operating a street railroad and to its servants engaged in the work of operating such street railroad?

*a.* Appellant's first point is that the defendant is not a street railroad corporation, but that it is a railroad corporation in the fullest sense of the word, possessing all the corporate powers as such. The defendant's charter in evidence shows that to be the fact. To this point appellant's main argument is addressed. It is urged that not only has the defendant such corporate powers granted by its charter, but that it has asserted them in court, has been permitted to exercise the right of eminent domain; that in a suit which reached this court it was heard to say that it was a railroad corporation of general powers and duties, as such that it could not be restricted, nor could it, by contract, restrict itself to the carrying of passengers only. [Railroad v. Kirkwood, 159 Mo. 239.] And the argument is pressed that defendant can not be heard to claim the rights, yet deny the liabilities of a general railroad corporation. Referring to the case just cited, Railroad v. Kirkwood, in which this defendant asserted its powers as a general railroad corporation and resisted the effort of the city of Kirkwood to restrict it to the dimensions of a street railroad company, we find that this court did not sustain the company in its assertion, but on the contrary the court, per GANTT, J., said: "We think the facts in evidence constituted plaintiff, so far as the city of Kirkwood is concerned, a street railway with the right to transport passengers only."

That essential differences exist between railroads and street railroads is recognized by the learned counsel for appellant in their briefs. They review the cases and texts cited in the briefs for respondent and cite many in their own briefs, showing the recognized differences, and mark the points that distinguish the one kind from the other, but they answer all that those law-writers say on the subject, by saying that this is not a street railroad company, it is a railroad

Vol 174 mo—5.

company in the broadest sense of the term, be-
cause its charter so declares, because it was in-
corporated under article 2, of chapter 42, Revised
Statutes 1889 (same chapter 12, Revised Statutes
1899), and not under article 8 of the same chapter
under which street railroad companies at that date were
usually incorporated, and they say, referring to a cor-
poration organized under article 8: "When a corpor-
ation, so organized, and actually confining itself to the
technical street railway business, is sought to be held
amenable to the  fellow-servant act, it will be  time
enough for this court to decide that question."

The argument of the learned counsel for appellant
proves this proposition, viz.:  the defendant having
by its charter acquired and assumed all the rights and
privileges appertaining to a general railroad corpora-
tion as such, is bound to assume also all the duties and
burdens imposed by law on a general railroad corpor-
ation as such.  If, therefore, our fellow-servant stat-
ute imposes on all railroad corporations, having the
charter powers given in article 2, chapter 12, Revised
Statutes 1899, liability for injury to any one of its ser-
vants through the negligence of his fellow-servant, and
if the statute so construed is constitutional, then this
defendant is liable in this case.  And so it would be,
if that were the law, regardless of the particular bus-
iness the corporation was engaged in at the time or of
the kind of work the injured servant and his fellow-
servant were doing.  If the corporation on its own ac-
count was erecting a depot building and a carpenter
engaged in the work was injured through the negli-
gence of another carpenter in the same work, both be-
ing employees of the company, the company on that
theory would be liable.  In such case it would not avail
the company, when sued, to say, "We were not at that
time engaged in an operation peculiar to a general rail-
road corporation, we were building a house, conduct-
ing the work in manner like any other house-builder

would do, and our employees were not subject to any greater or different risk than other carpenters in like work," for, to all that, on appellant's theory, the conclusive answer would be, "Your charter determines your character and fixes your relation to the fellow-servant statute." But that can not be the law. Our fellow-servant act itself draws a distinction which appellant's argument overlooks. It does not impose the liability on railroad corporations because they are railroad corporations, nor does it apply to them without reference to the business in which they are in fact engaged, nor to their employees in every capacity.

The language of the statute is: "Every railroad corporation owning or operating a railroad in this State shall be liable for all damages sustained by any agent or servant thereof engaged in the work of operating such railroad by reason," etc. Thus we see that by the very words of the statute the liability is not imposed on railroad corporations, *quia* railroad corporations, but on concerns that own and operate railroads in this State, and the liability is not for damages sustained by any servant of the company, but only by a servant engaged in the work of operating such road. From this it is clear that the lawmakers had in mind the kind of work in which the men whom they aimed to protect were engaged. The peculiar character of the work of operating a railroad was, to the minds of the lawmakers, the reason for making a peculiar class of the men engaged in that work and affording them relief not afforded to other hired servants, and imposing on their employers a liability not imposed on other masters. It is the peculiar character of the work that justifies the statute in the eyes of the Constitution, and it is upon that ground alone that its validity has been upheld. It is the condition and not the theory that justifies the law. This law applies to a master who as a matter of fact owns and operates a railroad, and to a servant who as a matter of fact is engaged in its work

of operating that railroad; it applies to no other master—to no other servant.

The business in which the corporation was engaged may have been such that its charter did not authorize, still when the attempt is made to bring the act within the scope of this statute the question is, not what was the company authorized to do, but what in fact was it doing and in what work was the injured servant engaged? The charter gives no answer to those questions; it is conclusive evidence of what the company had a right to do, but it is no evidence of what in fact it was doing. Whether under its charter defendant could lawfully engage in the street railroad business is a question between the State and the defendant; it is not in this case.

If, therefore, a corporation and its servants, who as a matter of fact are engaged only in operating a street railroad, are not covered by the fellow-servant statute, then the fact that the charter of the corporation authorizes it to own and operate a trunk line commercial railroad will not bring them within the statute, nor estop the corporation from showing the fact. The facts of this case afford an illustration of this principle. The evidence shows that from Sixth to Forty-first street, a distance perhaps of three miles, through a densely populated portion of the city, this defendant operated its cars over the same tracks over which the Suburban company operated its cars, and the cars of both companies were operated in the same manner; the only means by which the cars of one company could be distinguished from those of the other was that the defendant's cars were red while those of the Suburban company were yellow. It was against a yellow car that this car of defendant's was crushed, inflicting the injuries on the plaintiff. It could just as well have been the yellow car that was crushed against the other, and the conductor of the yellow car injured by the negligence of that motorneer. And suppose

that had been the case, could we say that the Suburban company was not liable because its charter called for a street railway, while the defendant in like circumstances was liable because its charter called for a regular commercial railroad? Where there are two concern engaged in precisely the same business, and both conducting it in precisely the same manner, a statute which would undertake to impose a liability on the one and not on the other, could not be sustained in the face of either our State or our Federal Constitution.

The defendant's charter is not decisive of this case.

b. The question remaining to be considered is, does the fellow-servant statute apply to concerns operating street railroads and to their servants engaged in that work?

In pursuing this inquiry we must keep in mind the fact that we are dealing with an act of class legislation that marks off certain employers of men and imposes on them a liability for injuries to their servants under certain circumstances which is not imposed on other masters, and we must remember that there is a reason that justifies that class discrimination, and that a case to fall within the operation of the statute must come within its reason.

It is conceded that the term "railroad" when used in a statute does not always include in its meaning a street railroad. The learned counsel for appellant in their brief say: "For some purpose the law recognizes several species of railroads and railroad companies, and recognizes a distinction between a 'railroad' and a 'street railroad.' Statutes using the general term 'railroad' may or may not apply to a 'street railroad.' " That is undoubtedly the law, and, therefore, when the word "railroad" is used in a statute, if we want to know if it is intended to embrace in its meaning a street railroad, we must look at the connection in which it is used.

In support of the contention that street railroads are included in the scope of the fellow-servant statute we are referred to St. Louis Bolt & Iron Co. v. Donohoe, 3 Mo. App. 559, and Koken Iron Works v. Railroad, 141 Mo. 228.

Those two cases decide that the statute giving contractors and materialmen a mechanic's lien on the property of railroad companies for their labor and materials entering into the construction of the roads, applies to street railroad companies. Although the mechanic's lien law is to some extent class legislation, yet the lines circumscribing the class or classes embraced within it are by no means as closely drawn as in the statute now in question. There was no reason seen in those cases for a legislative policy that would give a mechanic or materialman who should contribute to the building of an ordinary commercial railroad a lien for the value of his work or materials, and not give a like remedy to men who should build or furnish materials to build a street railroad.

In the first of those cases, the court per BAKEWELL, J., said: "It is also a fact, that acts of the Legislature may be passed, and that sections of certain laws are to be found in which railroads are spoken of, and when it is quite clear, nevertheless, that street railroads are not meant." But after recognizing that such distinctions existed, the court, with reference to the mechanic's lien statute then in hand, said: "We can see no reason for giving the remedy provided in this act in the case of one railroad which would not equally apply to every other railroad." That is to say, that the reason upon which that statute was founded was in every way as applicable to one kind of railroad as to another. In the second of those two cases, Koken Iron Co. v. Railroad, which was also a mechanic's lien case, this court referred to the first case with approval and per BARCLAY, J., said: "When we bring into view the various statutes affording liens for ma-

terials or labor furnished for the improvement of land, and consider the broad objects sought by such legislation, it seems clear that street railroads were not intended to be exempt from liability to respond to such lien claims in a proper case.''

The first of those cases was decided a good many years ago when the only street railroads in the city were horse railroads, and it was a horse railroad that the court was discussing. The court saw no difference between a horse railroad and an ordinary commercial railroad so far as the mechanic's lien law was concerned, and we see none, but if that case is authority for construing the fellow-servant statute to include street railroads it would be equivalent to saying that the reason upon which the fellow-scervant statute is founded applies as well to horse railroads as to other railroads.

Appellants' cause in this court has not lacked for ability and industry of counsel. They have favored us with three separate briefs, showing zealous research and learning, yet they have given us on this point reference to only those two cases. They refer also to section 1163, Revised Statutes 1899: ''The term 'railroad corporation' contained in this chapter shall be deemed and taken to mean all corporations, companies or individuals now owning or operating or which may hereafter own or operate, any railroad in this State.''

But that section of the statute does not reach this question.

It is conceded that the defendant is a railroad corporation and that it is operating a railroad, but the contention is that the kind of railroad it is operating is not the kind referred to in the fellow-servant statute. The section just quoted throws no light on that subject. We have a statute, section 1953, Revised Statutes 1899, making it a felony to place an obstruction upon, or to tear up, a railroad track, with intent to obstruct the passage of a car or cars thereon, and

under that statute men have been convicted with the affirmance of this court for attempting to blow up with dynamite a passenger car on a street railroad. [State v. Brennan, 164 Mo. 487; State v. Northway, Id. 513.]

It is also made a misdemeanor (sec. 1956) to throw a stone or other missile into or at a train or car or locomotive, and our St. Louis Court of Appeals has held that the offense was committed by throwing a stone at a car on a street railroad. [State v. Lang, 14 Mo. App. 247.]

Although those are penal statutes and therefore to be strictly construed, yet with the strictest construction is impossible to see any sound reason why they should not apply to persons maliciously threatening the lives and safety of passengers in a street car as well as in a car on any other railroad. The danger against which those statutes were aimed was not that which might result from mismanagement within, but from felonious assault without. The danger to the life of the passenger from such source in the street car is exactly of the same nature as that to the life of the passenger on the car of a commercial railroad; the difference, if any, is only in degree, and such difference is not obvious.

But neither the mechanic's lien law nor the penal statutes just quoted rest for their constitutionality on such narrow grounds as does the fellow-servant act—grounds that were earnestly contested until the question was finally decided.

The foregoing are the only Missouri decisions to which our attention has been drawn that can be said to bear on the question at all, and they are clearly distinguishable from the case at bar.

Before persons or corporations can be marked out for class legislation there must be in them or in their business or property some peculiar characteristic that, in the judgment of the lawmakers, justifies the distinction. [State v. Loomis, 115 Mo. 307.] An

act of class legislation, to stand in the face of the Constitution, must include all who belong to the class, not all who bear similarity in some characteristic to those included, but all who can not be distinguished from them in that particular characteristic which justifies the act. And it must include none who do not belong to the class, for if the Legislature must resort to the peculiarity of the business in which corporations operating steam railroads are engaged to find justification for the act in the eyes of the Constitution, it must limit the act to those in whose business is the same peculiarity found. When the validity of such an act is in question the courts will look into the nature of the class to see if it possesses peculiar features which might reasonably call for legislative action, but beyond that they will not interfere with the policy of the Legislature.

In the statute we are now considering the Legislature has marked out railroad corporations owning or operating railroads, and their employees engaged in the operation of their railroads, and has made a law applicable to them as a class. We must look into the nature of the business thus distinguished and ascertain what there is in it that justifies the act and what object the Legislature had in view in making the law; then if we find that the street railroad business is of the same nature and the men engaged in that business are within the class intended by the Legislature we must decide this case in appellant's favor.

In 1874 Kansas enacted a fellow-servant law applicable to railroad corporations alone, and very similar to our Act of 1897. The constitutionality of the act was contested upon the ground that it was class legislation, but the Supreme Court of the United States in Railroad v. Mackey, 127 U. S. 205, in deciding the question, said: "But the hazardous character of the business of operating a railway would seem to call for special legislation with respect to railroad corpora-

tions, having for its object the protection of their employees as well as the safety of the public. The business of other corporations is not subject to similar dangers to their employees, and no objections, therefore, can be made to the legislative act on the ground of its making an unjust discrimination.'' There was no question in that case as to the application of the statute to any other than a corporation operating an ordinary commercial railroad. What is there said of the peculiar hazard of the business to justify the statute, refers to commercial railroads.

In 1887 Minnesota enacted a fellow-servant statute of which ours is almost a literal copy. The Supreme Court of that State, in June, 1895, had for decision the very question now before us, in Funk v. St. Paul City Ry. Co., 61 Minn. 435. As the decision of that court construing its statute was rendered nearly two years before our statute, in almost the same words, was enacted, we may presume that our Legislature was aware of the interpretation that court put upon it. That court in two able opinions in the case held the statute did not include street railroads. The court, per BUCK, J., said: ''It is a matter of common knowledge that street cars operated by cable or electricity are more readily managed than those operated by steam, where long passenger and freight trains, with their weight and momentum, are not so easily controlled. Street cars are generally run separately, rarely with more than two or three coupled together, and there is but little danger of collision. They do not run so rapidly, their movements are easily and quickly checked, and the roadbeds are constructed upon level or graded streets, without deep cuts, and generally lighted. Nor do street railways carry freight. The greatest railroad hazard and danger of personal injury to railroad employees arises from operating freight trains. . . . Especially is the danger in coupling freight cars entirely absent.'' And

in the same opinion it is said: ''If we were to hold that the term 'railroad' in the law of 1887 applied to street railways because the word is broad enough to cover all roads constructed of iron or steel rails for wheels of cars to run upon, we see no reason why it should not be so construed whenever found in other legislation of this State.'' Then the court goes on to mention some of the requirements of other statutes in that State referring to railroads which it is manifest were not designed to apply to street railroads. And the same is true of our statutes in general relating to railroads. In a separate concurring opinion by MITCHELL, J., in that case, it is said: ''The difference in conditions affecting the risks to which employees are exposed is sufficiently substantial to authorize the Legislature to make the law applicable to ordinary commercial railroads alone, and furnishes, in my judg-. ment, ample reason for concluding that they so intended, and that they used the word 'railroad' in its ordinary popular sense, and in the sense in which they themselves had generally used it in other statutes.''

We have felt justified in quoting at length from the opinions in that case because they were dealing with precisely the same question that is now before us and construing a statute of their own which we afterwards copied. That is the only case to which we have been referred where the question as to whether street railroads were included in a fellow-servant act like ours, was decided, but there are many cases, referred to in the briefs of counsel, arising under other statutes, in which the distinction between railroads and street railroads are drawn, and the general doctrine runs through them all that the term ''railroad'' does not include ''street railroad'' unless so expressed or necessarily understood from the context; that as a rule, the term means ordinary commercial railroads only, and it is the exception when it means street railroads.

In Arkansas they have a statute authorizing a city to grant the right of way through its streets "to any railroad company," but the statute requires the railroad company to pay the property-owners the damages they may sustain thereby. In Williams v. City Electric Street Ry. Co., 41 Fed. 556, it was decided that the provision of the statute requiring damages to the property to be paid did not apply to the owners of a street railroad. The court, per CALDWELL, J., said: ".The difference between street railroads and railroads for general traffic is well understood."

In Iowa a statute made a judgment against "any railway corporation" for injury to persons or property, a lien superior to that of a mortgage. But it was held (Manhattan Trust Co. v. Sioux City Cable Ry. Co., 68 Fed. 82), that it did not apply to a street railroad company. Mr. Justice SHIRAS delivered the opinion of the court in which he said: "It can not be questioned, on the one hand, that a company engaged in operating street cars upon lines of rails laid down along the streets of a town or city, for the transportation of passengers, is, in one sense, a railway corporation, nor, upon the other hand, that there is a marked and recognized distinction between street railway lines and those engaged in the general passenger and freight traffic of the country."

In Oregon a statute gave the right to condemn land to "all railway corporations," but it was held that that did not include street railway companies. [Thomson-Houston E. Co. v. Simon, 20 Ore. 60.]

Iowa adopted a fellow-servant law applicable only to railroad companies in 1862 and the Iowa court has recognized the narrow constitutional ground on which the statute stands and has been careful to keep it on that ground. In Deppe v. Railroad, 36 Iowa 52, the court said: "The manifest purpose of the statute was to give its benefits to employees engaged in the

hazardous business of operating railroads. When thus limited it is constitutional; when extended further it becomes unconstitutional.'' The peculiar hazardous business of operating railroad trains, distinguished from other kinds of business, as the ground upon which the statute is founded, is emphasized in other cases in the same court. [Schroeder v. Railroad, 41 Iowa 344; Stroble v. Railroad, 70 Iowa 555; Butler v. Railroad, 87 Iowa 206; Larson v. Railroad, 91 Iowa 81; Akeson v. Railroad, 106 Iowa 54.] Although the question of the applicability of the fellow-servant statute to street railroads does not seem to have come before the Iowa court, yet what is said in those cases as to the purpose of the statute leaves us to infer that it would place men engaged in operating street cars outside of the pale of that statute.

It is not the mere fact that men engaged in operating railroads are subjected to hazard that has called forth the legislative action, for men to whom no such protection is afforded are engaged in other kinds of business that are hazardous to as great or greater degree, as for example some kinds of mining, tunneling, etc., but it is the peculiar nature of the hazard incident to the railroad business that makes the foundation of this statute. Reference to this peculiarity runs through all the cases sustaining the validity of the fellow-servant statutes. In Railroad v. Ellis, 165 U. S. 150, Mr. Justice BREWER said: ''The business in which they are engaged is of a peculiarly dangerous nature, and the Legislature, in the exercise of its police powers, may require many things to be done by them in order to secure life and property. Fencing of railroad tracks, the use of safety couplers and a multitude of other things easily suggest themselves.'' In Lavallee v. Railroad, 40 Minn. 249, the court said: ''The frequency and magnitude of dangers to which those employed in operating railroads are exposed; the difficulty, sometimes impossi-

bility, of escaping from them with any amount of care when they come; the fact that a great number of men are employed, co-operating in the same work, so that no one of them can know all the others, their competency, skill and care, so that he may be said to voluntarily assume the risk arising from want of skill or care by any one of the number—are a sufficient reason for applying the rule of liability on the part of the employer to the employee so employed different from that ordinarily applied between master and servant. But no just reason can be suggested why such difference should be founded, not on the character of the employment, nor of the dangers to which those employed are exposed, but on the character only of the employer." In Johnson v. Railroad, 43 Minn. 222, the court was considering what employees were within the scope of the fellow-servant statute, and said: "Therefore, after mature consideration, our conclusion is that, if any limitation is to be placed by the courts upon the application of this statute (and on constitutional grounds there must be) the only one which will furnish any definite or logical rule is to hold that it only applies to those employees who are exposed to the peculiar hazards incident to the use and operation of railroads, and whose injuries are the result of such dangers."

Men engaged in the operation of street railroads are exposed to hazards, but not to the peculiar hazards to which men engaged in operating ordinary commercial railroads are exposed, and which have made them a class for special legislation. In 1897 when this law was enacted there were still some street railroads in this State operated by horse power. If the law applies to street railroads at all it applies to street railroads of all kinds and if it applies to them now it applied to them when it was first enacted, and if so, then there was no difference in its application to the driver of a horse car and a brakeman on a freight train. There are employ-

ments attended with even greater hazard than the operating of a railroad, but men engaged in those employments are not included in this class because the hazard is not of the same character. And there are men in the employ of railroad corporations who are not within the class, because they are not engaged in operating the railroad. Thus the lines around the class are drawn and men who do not fill the description are not within those lines.

Running through all our statutes on the subject there is an obvious distinction shown between railroads and street railroads. No one can read article 2 of chapter 12, Revised Statutes 1899, and gather the idea that it has any reference to street railroads. Then follows article 3 which relates to street railroads only. The very fact of the frequent use of the term "railroad" in our statutes in such connection as to indicate that the Legislature understood that it would be taken as a matter of course to mean an ordinary commercial railroad, shows that the usual use of the word is with that meaning, and when some other meaning is intended some additional word is used. Thus section 1180, Revised Statutes 1899: "It shall be the duty of every street railway company or corporation operating a street railway across the tracks of a railroad company to bring its cars to a full stop at least ten and not more than twenty feet before reaching the tracks of the railroad company. And it shall be the duty of the conductor, or some other employee of the street railway company, to go forward to the tracks of such railroad company for the purpose of ascertaining whether a train is approaching such crossing." In that connection the word "railroad" is brought into sharp contrast with the words "street railway" and the Legislature took it for granted that any one reading the section would understand that "railroad" meant commercial railroad and therefore did not add any word of qualification or explanation.

In the Laws of 1897, page 96, is this fellow-servant law, in which the term "every railroad corporation" is used, and immediately following on the same page is another act in these words: "The railroads of this State are required to carry peddling cars of watermelons or cantaloupes, strawberries, blackberries and other perishable fruits," etc. The word "railroads" in the latter act is used as unqualifiedly as the word "railroad" in the former, yet the lawmakers took it for granted that every one would know what the word "railroad" meant. Then on the next page of the same book there is an act having in view the construction of a street railway and the term "street railway" is used.

The title to article 2, chapter 12, is "Railroad Companies," that to article 3 is "Street Railroads." Then comes article 4, "Railroad classification—Charges—Commissioners." The first section of article 4 is: "All railroads in the State of Missouri are hereby divided into three classes, to be known as class A, class B and class C." Then follow definitions of the classes, and regulations as to charges for passengers and freight, duties of railroad commissioners, etc. Although the words of that statute are "all railroad corporations in the State of Missouri," yet manifestly it does not include street railroads.

Article 7 of the same chapter which points out the procedure to be followed in condemning private property for public use, refers in general terms to "any road, railroad, telephone, telegraph or other corporation created under the laws of this State." There, not only is the term "railroad corporation" used in unlimited form, but it is followed by the still more general and comprehensive term, "other corporation created under the laws of this State," yet no street railroad chartered under article 3 of that chapter has ever been accorded the right of eminent domain. The only right of way such corporation can obtain is by grant from

the city over its streets or by grant from private owners. [Sec. 1187, R. S. 1899.]

There are many other sections of our statutes referred to in the briefs of the learned counsel in which the term "railroad" or "railroad corporation" is used without qualifying words, yet manifestly referring only to commercial railroads, but we will not now discuss them, because this opinion is already too long. In almost every instance where street railroads are intended in our statutes, "street railroads" are named; in every instance where commercial railroads are intended the word "railroads" only is used.

The Fellow-Servant law of 1897 does not designate street railroads by name nor by any words necessarily indicating an intention to include them, and as such companies are neither within the letter nor reason of the law, it does not apply to them.

This is the view the learned trial judge took of the law and he was correct.

The judgment is affirmed. *Robinson, C. J., Marshall* and *Fox, JJ.*, concur; *Brace, Gantt* and *Burgess, JJ.*, dissent.

## DISSENTING OPINION.

GANTT, J.—This is an action for damages growing out of personal injuries alleged to have been suffered by the plaintiff through the negligence of defendant, a railroad company organized under the laws of this State and operating a railroad from the corner of Sixth and Locust streets in the city of St. Louis to Meramec Highlands, a point on the Meramec river in St. Louis county in this State.

The petition alleges that plaintiff was a conductor and employee of defendant on said railroad on January 27, 1898, and on said day one Jesse B. Horn was also an employee of said railroad company as motor-

Vol 174 mo—6.

neer of car number 348 of which plaintiff was conductor; that said car was propelled by electricity; that in operating said car it was the custom when a car reached the eastern terminus of said road at Sixth and Locust streets in St. Louis to change the operating machinery so as to return said car westwardly over the tracks on which it had come; that the motorneer would bring his car to a standstill and turn off the electric current from the machinery. The conductor then would release the rope which held the trolley-pole to the wire, alight from his car, pull down the trolley-pole from the overhead wire, and by means of a rope which was attached to one end of the trolley-pole move the trolley-pole around to the opposite end of the car, and again by releasing the rope, raise the trolley-pole to the overhead wire, and while the conductor was so engaged the motorneer was required to keep the power or electric current turned off so that the car would remain stationary, but that at the time and on the day mentioned in the petition, while plaintiff as conductor was carrying the trolley-pole around to the opposite or east end of said car, Horn, the motorneer, negligently failed to withhold the electric current from the machinery, but did, without the knowledge of plaintiff and while plaintiff was reversing the trolley-pole, so arrange the machinery as to admit of the entrance of the electric current from the overhead wire into the machinery of the car and while the said car was thus arranged the plaintiff, unaware of this negligent act of Horn, raised the trolley-pole to the overhead wire, thus connecting the car with the overhead wire and immediately the electric current, by reason of the negligent act of Horn as aforesaid, entered the machinery of the car and caused it to suddenly bound forward with great force and violence against and upon plaintiff, whereby plaintiff was knocked and forced upon and against the platform of another of defendant's cars, then and there stand-

ing upon the track in front of said car; that his right hand was crushed and mashed so that he has lost the use of it permanently; that his right leg was crushed and disabled forever; from all of which injuries he is permanently disabled, to his damage in the sum of twenty-three thousand dollars.

The answer contains first, a general denial, second, a plea of contributory negligence, and third, the following special defense:

"Said defendant, further answering said petition, states that it was on the occasion in question, is now, and has been for a long time, a street railroad corporation only, organized and existing under the laws of the State of Missouri for the purpose only of operating, and it was, has been and is only operating a street railroad by electricity for the carriage of passengers, and said railroad company was neither organized nor incorporated for operating a railroad by steam, nor has it ever operated a railroad by steam, nor was it on the occasion in question, nor did it then nor has it at any time since, operated any other than a street railroad for the carriage of passengers on its said line beginning at or near Sixth and Locust streets in said city of St. Louis and running in a westerly direction over various streets in said city to the western boundary of said city. That on the occasion in question the agents and employees of defendant named in plaintiff's petition and charged with negligence in the performance of their duties, to-wit, James B. Horn, motorman, and ——— Hogan, were the fellow-servants of the plaintiff in and about the operation of the car of which the said plaintiff was conductor, and which was one of the cars that the said defendant used in the operation of its said street railroad on its line of street railroad aforesaid, and said defendant further says that the said plaintiff, by virtue of his employment as fellow-servant of said Horn and Hogan, assumed the risk on his part of any neg-

ligence on the part of said agents or employees of
defendant, or either of them, as fellow-servants of him,
the said plaintiff, and that if, on the occasion in ques-
tion, the plaintiff was injured in consequence of any
negligence of either said Horn or said Hogan, the
said plaintiff by virtue of his said employment and
by virtue of the said Horn and Hogan being his fel-
low-servants in the operation of said car at the place
where he was injured and on the occasion in question,
assumed the risk of said negligence by virtue of the
nature and character of his, the said plaintiff's em-
ployment by said defendant, and said defendant is not
liable to said plaintiff for any injury caused on the
occasion in question by any negligence, if any, which
the said Horn or the said Hogan was guilty of, causing
the injuries complained of by said plaintiff in his peti-
tion.''

Plaintiff replied denying all the new matter set
up in the answer.

There was substantial evidence tending to prove
the allegations of the petition as to the manner in
which the injury to plaintiff occurred. Plaintiff also
offered and read in evidence the articles of incorpo-
ration of defendant showing it was organized under
the general railroad laws of this State known as ar-
ticle 2, chapter 42, Revised Statutes 1889, and evi-
dence showing its proceedings as such to condemn
lands for a right of way in St. Louis county. Also
evidence of the extent and nature of his injuries.

At the close of plaintiff's case the defendant
prayed and the court gave an instruction that under
the pleadings and evidence the verdict must be for
defendant, and thereupon plaintiff took a nonsuit with
leave to move to set the same aside, and afterwards
and within four days moved the court to set aside
said nonsuit, and among other things assigned as
error the giving of said instruction, which motion the

court overruled, and thereupon plaintiff perfected his appeal in due form to this court.

## I.

This record requires a construction by this court of the scope and effect to be given to an act of the Legislature of this State, approved February 9, 1897, and commonly known as the Fellow-Servant act.

It is entitled ''An Act to define the liabilities of railroad corporations in relation to damages sustained by their employees, and to define who are fellow-servants and who are not fellow-servants, and to prohibit contracts limiting liability under this *act.*''

The first section is as follows:

''Every railroad corporation owning or operating a railroad in this State shall be liable for all damages sustained by any agent or servant thereof while engaged in the work of operating such railroad by reason of the negligence of any other agent or servant thereof: Provided, that it may be shown in defense that the person injured was guilty of negligence contributing as a proximate cause to produce the injury.''

By sustaining the demurrer to plaintiff's evidence the trial court obviously held that defendant was operating a street railroad and that the above quoted statute had no application to street railroads; in short that the words, ''every railroad corporation owning or operating a railroad in this State,'' do not mean ''every railroad,'' but those only which own or operate steam railroads and the word ''railroad,'' must be restricted to those only who operate their cars in trains and by steam as the motive power.

That the words of the act ''every railroad corporation'' are broad enough in themselves to include street and electric railroads, as well as steam railroads, will not be denied; that they are plain, unam-

biguous and comprehensive enough to include all railroads can not be doubted. Prima facie the act applies to street railroads as well as any and all other railroads. [Bloxham v. St. Ry. Co., 29 L. R. A. 507.]

The rule of construction is that where a law is clearly expressed it is the duty of the court to adhere to the literal expression unless such construction would lead to a palpable absurdity.

Thus in Smith v. State, 66 Md. 215, a married woman was sued jointly with her husband and she pleaded specially her disability of coverture, to which plaintiff demurred. This brought the Act of 1872 of that State before the court for construction, which provided that "any married woman may be sued jointly with her husband on any bond," etc. The contention was that the act did not apply to official bonds, but said the court: "Whatever latitude may, at one time, have been assumed by courts in the construction of statutes, the more recent cases have established the rule that when the language of a legislative enactment is clear and unambiguous, a meaning, different from that which the words plainly imply, can not be judicially sanctioned. [Citing Green v. Wood, 7 Adolp. & E. 185; Woodbury v. Berry, 18 Ohio 462; United States v. Ragsdale, Hemp. 497; Bosley v. Mattingly, 14 B. Mon. 89.] When the Legislature says she may be sued on *any bond* executed jointly with her husband, can the judicial department of the government undertake to say that the lawmakers meant she shall not be sued on *some bonds* executed jointly with her husband? Such a determination could only be reached by a species of judicial legislation not sanctioned by an authority, and extremely dangerous if once established as a precedent."

In Woodbury v. Berry, 18 Ohio 458, the Supreme Court came to the conclusion that certain words had by accident or oversight been omitted from an act, but notwithstanding this they say, "*ita lex scripta est.*

The language as it stands is clear, explicit and une-
quivocal.'' ''It is our legitimate function to interpret
legislation, but not to supply its omissions.'' [Citing
Sedgwick on Stat. and Const. Law, 231.]

In Bradbury v. Wagenhorst, 54 Pa. St. 180, the
statute required a copy of the instrument sued on to
be filed with the clerk before judgment should be en-
tered.   It was contended that there was no necessity
for a copy of claims since the mechanic's lien law re-
quired a bill of particulars to be filed in order to make
a lien but the court answered, ''Whatever may have
been the legislative thought, no ambiguity. exists in
what they have said, and when the words of a statute
are plainly expressive of an intent, the interpretation
must be in accordance therewith.''

So in Bennett v. Worthington, 24 Ark. 487, it was
urged that the statute of limitations ought not to run
during the time the courts were closed on account of
the war between the States, but the Supreme Court
held that as *no such exception* was included in the
statute, the court could not enforce the equity in be-
half of plaintiff, saying, ''The correct rule to be ex-
tracted from the authorities is, that where the will of
the Legislature is clearly expressed, the courts adhere
to the literal expression of the enactment without re-
gard to consequences, and every construction derived
from a consideration of its reason and spirit should be
discarded.''

At the time this law was enacted there was a
general provision in our statutes defining the term
''railroad corporation,'' as follows:

Section 1163, Revised Statutes 1899: ''The term
'railroad corporation' contained in this chapter shall
be deemed and taken to mean all corporations, com-
panies or individuals now owning or operating or
which may hereafter own or operate any railroad in
this State.''

But it is plausibly and ably contended that in the various laws of this State governing railroad corporations, the word "railroad" has a well-defined and clearly-understood meaning and is never confounded with "street railroad," and various sections of the general railroad law are cited to show that they have no reference to street railroads. That there are many provisions of the various acts in regard to railroads which do not apply to street railroads may be and is conceded, but the statement of counsel is entirely too broad when they assume that those laws do not apply at all to street railroads, as an examination of the decisions of this court will clearly demonstrate.

In Koken Iron Works v. Railroad, 141 Mo. 228, it was contended by the defendant, a street railway company, that sections 6743, 6744, 6747, 6754 and 6756, Revised Statutes 1889, giving a lien for work and material upon the roadbed, depots, rolling stock, stationhouses, etc., did not in terms and were never intended by the Legislature to embrace street railways, but this court held adversely to its contention saying, "Undoubtedly, much of the language of that law is applicable to railroads operated by steam. Those were the roads to which the act was chiefly designed to apply. But the general terms of the law are also susceptible of application to street railroads, and we find nothing in any part of the enactment to indicate that such application is not intended. . . . Laws of this nature should receive a fair and rational interpretation, and full effect be given to the remedial purpose that constitutes their spirit."

The St. Louis Court of Appeals had previously given those sections the same interpretation in St. Louis Bolt & Iron Co. v. Donohoe, 3 Mo. App. 559, in which Judge BAKEWELL, speaking for the court, says: "It is a fact that acts of the Legislature may be passed, and that sections of certain laws are to be found in which 'railroads' are spoken of, and where

it is quite clear, nevertheless, that street railroads are not meant. But we do not see how these facts affect the question here. A street railroad or horse railroad is none the less a railroad, because the Baltimore & Ohio road is also a railroad; and where the Legislature cites the term *without limitation*, it will be taken to use it *in its broadest sense*, unless it appears from the face of the enactment that it meant to restrict the word to one class of railroads or the other."

But again. Section 1953, Revised Statutes 1899, makes it a crime to obstruct *any railroad*, and this court in the cases of State v. Brennan, 164 Mo. 487, and State v. Northway, 164 Mo. 513, held that the term "railroad" was broad enough to include cable and electric street railroads.

The same conclusion was reached by the Supreme Court of California upon an altogether similar criminal statute (People v. Stites, 75 Cal. 570), and the identical point was again affirmed in Price v. State, 74 Ga. 378, and Com. v. McCaully et al., 2 Dist. Rep. (Pa.) 63. [Milvalle Bor. v. Railroad, 131 Pa. St. 1.]

In Gyger v. Railroad, 136 Pa. St. 104, the Supreme Court of Pennsylvania laid down a very satisfactory rule, to-wit, that "railway" and "railroad" are synonymous and in all ordinary circumstances are to be treated as without distinction, and when either of them is used in a statute and the context requires that a particular kind of road is intended, that kind will be held to be the subject of the statutory provision, but if the context contains no such indication and either of the words are used in describing the subject-matter, the statute will be held applicable to *every species* of road embraced within the general sense of the word used.

In Railroad v. Philadelphia, 89 Pa. St. 210, it was held that the word "railroad" applied to street railways.

Indeed, as pointed out by Judge Bakewell in St. Louis Bolt & Iron Co. v. Donohoe, supra, the first street railroads constructed in the city of St. Louis were constructed under the then existing general railroad corporation laws of this State and it was not until 1866 that the general act concerning corporations was passed authorizing the formation of manufacturing and business companies for the purpose of constructing horse railroads. In Illinois an act passed in 1855 whilst horse railroads were in existence in Illinois giving certain powers to "railroads" was held to include "horse" as well as "steam" railroads. [Chicago v. Evans, 24 Ill. 52.]

These cases sufficiently indicate that it is not accurate to state that the word "railroad" always refers to steam railroads and that when street railways are to be included they are specifically named as such; on the contrary the great weight of authority is that if the context contains no such indication, a statute containing the word "railroad" will be held to include every species of railroad which is embraced within the general sense of that word.

Looking now more closely to the act we find it is a short remedial act of four sections only, and not a word is in it to indicate that it was the intention of the Legislature to restrict it to steam railroads operating long trains. Being remedial the universal rule is that it *should* receive a *liberal construction* to cure the evil which it was intended to remedy. "The old law, the mischief and the remedy must be kept in mind." Prior to the enactment of this statute, the course of decision was that a master in this State was not liable to his servant for injuries occasioned by the negligence of his fellow-servant. For many years counsel endeavored to get this court to change this rule, but the answer was that this was a legislative function; that it was the duty of the court to declare, not to make, the law. It is within the knowledge of all

of us that this ruling occasioned the passage of this law.

But counsel urge that the reason of the law would exclude its application to street railways because they say "in the operation of the car *two* persons only were employed, a conductor and a motorman, and the reason for changing the law was that steam railroads had a large number of employees operating freight and passenger cars in trains, and there resulted a consequent want of opportunity on the part of the employees to observe and watch their co-employees in the same service and thus discover their negligence and an opportunity to quit the service if these negligent co-employees were not discharged." Doubtless this was one of the reasons, but it can not be that it was the only one, because if it was, if an employee as a fireman closely associated in the same cab with an engineer was injured by the negligence of the latter, it could be urged with the same plausibility that being *so closely* associated they did not fall within the reason which prompted the passage of the act, to-wit, that they had no opportunity to watch the conduct of each other. There is no such exception written in the law. Under its terms an employee injured by the negligence of another servant of the same company would not be turned out of court because his employment brought him so closely in contact with him that he could observe his conduct. If a fireman or engineer, then, can recover for injuries occasioned by the other whose duties call them together on the same cab, how can it be maintained that a motorman or conductor, operating at different ends of the same car, is not equally entitled to be protected from the negligence of the other? Moreover, since the application of electricity and the operation of cars by cables, it is not true that only one car can be operated, but frequently it occurs that two and three cars are connected in the same train. Neither can it be said that the high

rate of speed of steam cars makes it necessary to apply a different rule, as the modern electric car easily makes from eighteen to twenty-five miles an hour. It is true that the Supreme Court of Minnesota, a tribunal whose opinions and judgments entitle it to our highest respect, attached great importance to these considerations in Funk v. St. Paul City Ry. Co., 61 Minn. 435. It is proper to remark, moreover, that the Minnesota court based its opinion upon an additional reason. On page 439 of the report it is said: "It is claimed by appellant's counsel, and not denied by the counsel for respondent, and such we believe to be the fact, that on February 24, 1887, when the general law of that year was passed, there were no cable or electric street railways in existence in this State. If so, what was the legislative intent in using the word 'railroad' in the law of 1887, to be deduced from the whole and every part of the statute taken together, upon the subject of railroads? When the words of a statute are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and the object and remedy in view. [Potter's Dwar. St. 194, note 13.] What was the mischief felt which resulted in the passage of this law? Was it a danger known, or one unknown? We must assume that it was dealing with, and acting *upon, existing facts* within its knowledge. Of course, if the language used was entirely free from ambiguity, and broad enough to include unknown things which might spring into existence in the future, they would be deemed to come within, and be subject to, the evident meaning of the terms used."

Much weight is given by both the learned judges who filed opinions in that case to the fact that in the previous legislation in that State the word "railroad" had not been applied to street railways. It must be apparent that the first reason given, to-wit, that at the time the Minnesota Fellow-Servant Act was passed,

to-wit, in 1887, there was no such thing as a cable or electric car in Minnesota, could have no force in interpreting our Act of 1897, which was enacted years after our cities and towns in Missouri were gridironed with both systems of street railroads, and therefore our Legislature could not be charged with legislating in ignorance of the character of such roads, neither has our Legislature nor have our courts made the distinction between "railroads" and "street railroads" that the learned jurists discovered in Minnesota, as we have already shown, and while the history of railroad legislation in that State may have justified the conclusion reached by that court, the facts upon which that adjudication was bottomed do not and did not exist in Missouri when the Act of 1897 under consideration was passed.

The statute before us has been construed by the St. Louis Court of Appeals in the case of Stocks v. St. Louis Transit Company at the October term, 1902, of said court, and held to apply to street railways, citing with approval, Rafferty v. Central Traction Co., 147 Pa. St. 579; City of Clinton v. Street Ry. Co., 37 Iowa 61.

BLAND, J., in Stocks v. Transit Co., supra, referring to the contention that by using the word "railroad," this act must be construed with reference to our general railroad act, pertinently remarks: "The Act of 1897 is not a railroad act, and is not *in pari materia* with any of the general laws of the State concerning railroads, and for this reason can not be interpreted by them. It is a fellow-servant act, intended for the benefit of the employees of railroad corporations, and designed to place them on the same footing as to the right to recover damages caused by the negligence of their co-employees. The act confers on a class of employees of railroad corporations a right of action which they did not have before and we can see no sound

reason for confining the benefits of the act to but one class of railroad employees.''

But it is earnestly insisted that in construing this act we must bear in mind that this is class legislation, and to sustain the constitutionality of the act we must be convinced, in applying it to street railways, that they fall within the reason of the statute, otherwise the act is unconstitutional. This is a grave contention, because if sound it must result in our holding, not only that the language of this act does not include street railways, but that it would not be in the power of the Legislature even by using the words ''street railways'' to make them amenable to its provisions.

To sustain their position the learned counsel have recourse to the opinion of the Supreme Court of the United States sustaining the constitutionality of the fellow-servant act of Kansas, in Railway v. Mackey, 127 U. S. 205, in which it is said in justification of that law against the charge of unnatural and unreasonable classification, that ''the hazardous character of the business of operating a railway would seem to call for special legislation with respect to railroad corporations, having for its object the protection of their employees as well as the safety of the public. The business of other corporations is not subject to similar dangers to their employees, and no objections, therefore, can be made to the legislation on the ground of its making an unjust discrimination.''

The fellow-servant act applicable to railroads only has been upheld by the same court for a similar reason in Railroad v. Ellis, 165 U. S. 150. And in the various States adopting a like statute. [Lavallee v. Railroad, 40 Minn. 249; Johnson v. Railroad, 43 Minn. 222; Powell v. Sherwood, 162 Mo. 605; Cambron v. Railroad, 165 Mo. 543; Railroad v. Herrick, 127 U. S. 210.

Because the courts in sustaining these acts have pointed to the peculiar hazards to which railroad em-

ployees are exposed to defend the statutes against the charge of unjust discrimination, it is assumed that a fellow-servant act applicable to street railways would be unconstitutional because the employees of such corporations are not subjected to all the hazards that beset employees of steam railroads. It is admitted that employees in the operation of street railroads, especially those engaged in operating cars on which electricity is the motive power, are exposed to great hazards, but it is said they are not the *peculiar hazards* which attend the operation of steam railroads, and therefore they do not, and if the argument is sound can not, come within the same class as employees of steam railroads. We can not subscribe to this contention. In our opinion it was entirely competent for the Legislature to have enacted a general fellow-servant law which would have applied to all masters and servants, and it was also within its power to enact this law governing the liability of railroads to their employees and to include therein, as we hold they did do, the employees of *all* railroads, street and electric railroads as well as steam railroads.

It is not to be questioned that in the exercise of its general remedial and police powers the Legislature may enact laws for the health and safety of our citizens, and when a given subject is within its power, the extent to which it is to be exercised is within the discretion of the Legislature. It is within the common knowledge of us all that at the time this act was passed nearly all the street railways in this State were being operated by electricity, and those that were not were rapidly being converted into electric roads; that this motive power was exceedingly hazardous and dangerous. It is not insisted that it would not be wise and humane legislation to throw around the employees operating these cars the same protection that is given an operative on a steam railroad, but only that the

general words do not include them, and if they did they are not in the *same class.*

To this we answer that when it is conceded that their avocation subjects them to perils from the negligence of their fellow-servants, it is not for this or any other court to say to the Legislature, you shall not enlarge the class so as to include the employees of *all* railroads, but shall restrict it to steam railroads alone. In a word, we hold that an act of the Legislature is not to be declared void unless the violation of the Constitution is so manifest as to leave no room for doubt. [Ogden v. Saunders, 12 Wheat. 213; Sinking-Fund Cases, 99 U. S. 700; State v. Layton, 160 Mo. 499.] As said by the Supreme Court of Ohio, in State v. Nelson, 39 N. E. 24: "The appliances and construction of cars, and in fact all kinds of machinery are continually changing, and it is within the exclusive authority of the General Assembly, in the exercise of its police power, to determine by general laws what, if any, regulations are required for the protection of the health, safety, and comfort of the operatives." Because the Supreme Court of the United States and this court and all other courts now hold the fellow-servant act applicable to railroads is not unconstitutional classification because the business is hazardous, it by no means follows that this class should not include all railroads; on the contrary the classification would seem less objectionable when it includes in it all who are subjected by their employment to similar hazards, albeit not exactly the same. We hold that a construction of the act before us which makes it applicable to the employees of street railways would not render it unconstitutional.

In view of the remedial character of this act, the absence of anything in any portion of the act indicating a purpose to restrict it to steam railroads, and the decisions in this State which have applied certain general provisions of our railroad laws alike to street

railways and steam railways, and because the plain unambiguous words of the act are broad enough to include street railways, we hold that the act means what it says, and that street railroads are liable in the same manner as steam railroads to their employees for the negligence of their co-employees or fellow-servants.

## II.

But were this not so, in our opinion the defendant in this case would still be liable for the reason that it is a railroad corporation organized under the general railroad laws of this State with all the powers and subject to all the liabilities of any other railroad corporation. The evidence shows beyond question that it was incorporated under and by virtue of article 2, chapter 42, Revised Statutes 1889, for the purpose of constructing, maintaining and operating a standard-gauge railroad for public use in the carriage of persons and property, and "to be constructed from a point in the city of St. Louis in a general southwesterly direction through or near the towns of Maplewood, Old Orchard, Tuxedo Park, Webster Groves and Kirkwood to a point on or near the Meramec river within the limits of St. Louis county."

It further appears that by virtue of its charter it exercised the right of eminent domain in condemning a right of way under and by virtue of the powers conferred upon steam railroads in this State.

There was also evidence that it carried express and the United States mail between St. Louis and Kirkwood. It is true that the motive power employed by defendant is electricity, but all the cases agree that the motive power is not a determining feature in distinguishing a street railway from a general railroad which carries both freight and passengers. So that

Vol 174 mo—7.

we have a case in which the corporation has elected
to take its charter under the general railroad law of
the State and has voluntarily placed itself in the class
of roads to which it concedes the Act of 1897 properly
and necessarily applies.   But defendant argues that
because it only carries passengers over that part of its
road which lies along and in the streets of St. Louis,
and by express permission in the streets of Kirkwood,
it should to that extent be regarded only as a street
railroad, but we do not think its contention is tenable.
It is still a railroad, notwithstanding the city of St.
Louis and other municipalities would not permit it to
run its freight trains over their streets.   These cities
are empowered by the Constitution and general laws
to exclude it from their streets, and if it has entered
into conventions with them whereby it denies itself
in those localities the right to carry freight on condi-
tion that it may operate cars on their streets for pas-
sengers only, it has not thereby changed the charter
which alone authorizes it to exist as a corporation
and thus relieved itself of its obligation to State laws.
It remains a railroad corporation operating a rail-
road in this State and falls within both the language
and spirit of the Act of  1897.   Can it be that if this
accident and injury had occurred to plaintiff on de-
fendant's line out in St. Louis county defendant would
be heard to say under its charter that it was not a rail-
road within the meaning of the Act of 1897?   Assur-
edly not.   But it would in that case still be the same
railroad that runs into and delivers its passengers in
the city of St. Louis.   It is one corporation and op-
erating one railroad and it is not subject to a different
liability in the city from what it is in the country.   In
our opinion it is clearly within the provisions of the
Act of 1897 and the  circuit court  erred in  holding
otherwise.

It is said, however, the liability is not imposed
"on railroad corporations because railroad corpora-

tions, but on concerns that own and operate rail-
roads," and that therefore the charter of this defend-
ant does not determine its liability, but how can that
affect the defendant's liability when it is confessedly
both a "railroad corporation," to which this act in
terms applies, and at the same time owns and is op-
erating a railroad, by every test known to the law.

We fully agree that the servant who can avail
himself of the protection of this statute must be one
engaged in the work of operating such road.

In Callahan v. Merchant's Bridge Terminal Rail-
road Company, decided at this term, by the Court in
Banc, 170 Mo. 473, we held that this right was not lim-
ited to those who are engaged in running trains, but to
those employees also whose work is directly essential
to enable trains to run, and in so doing we were fully
supported by the decisions of the Supreme Court of
Kansas in Railroad v. Pontius, 52 Kans. 264, and of
the Supreme Court of the United States affirming
that view in Pontius v. Railroad, 157 U. S. 209.
[Stubbs v. Railroad, 85 Mo. App. 192.]

It may be well to note that the Supreme Court of
the United States, in enumerating the grounds upon
which it sustained the Kansas law, noted that it ap-
plied "to *all railroad corporations without distinc-
tion*," and so does the Act of 1897. So that we have
not a case where some corporation other than a rail-
road or some person is operating a railroad, but we
have a case within the exact language of the act, to-
wit, a "railroad corporation, owning and operating
a railroad in this State," and the servant who is suing
was a servant engaged in operating such railroad, and
was hurt by another servant engaged in operating the
said railroad, and the question is, shall the act of the
Legislature, made for identically such a case, be en-
forced, or shall we turn the plaintiff out of court sim-
ply because the car which said employees were oper-
ating was not operated by steam and was not one of a

long train or that said railroad company was permitted to run only passenger cars in the streets of St. Louis and Kirkwood by the ordinances of said cities, the right having been conferred on said municipalities by our Constitution and general statutes to allow said company to run its trains within the corporate limits or to deny it that right? In the case supposed of the Suburban car crushed against the car on which plaintiff was employed, we have no doubt whatever that the conductor of the Suburban car could recover against the defendant for the negligent act of the servant and we also agree, as already said, that the Suburban or any other street railway company under the unrestricted terms of this act is a railroad and liable to one of its servants who is engaged in the operation of its road by another servant of said company. In our opinion the judgment should be reversed and the cause remanded for a new trial in accordance with the views we have expressed.

*Brace* and *Burgess, JJ.,* concur in my views.