CHICAGO, M. & ST. P. RY. CO. v. WESTBY.

(Circuit Court of Appeals, Eighth Circuit. April 12, 1910.)

No. 3,146.

*(Syllabus by the Court.)*

**1.** CONSTITUTIONAL LAW (§§ 211, 245*)—EQUAL PROTECTION OF LAWS—REQUISITES OF CONSTITUTIONAL CLASSIFICATION—EMPLOYER'S LIABILITY LAW.

The employer's liability law of South Dakota (Laws 1907, c. 219) excepts from the general law of the state all common carriers and all their employés, subjects the former to and grants to the latter causes of action for injuries to the employés caused by the negligence of their fellow servants and for those to which their own negligence contributes, while no such liabilities are imposed upon other employers and no such rights are granted to other employés. The fourteenth amendment to the Constitution forbids any state to "deny to any person the equal protection of the laws." *Held:*

(1) Legislatures of states for some sound reason of necessity or propriety inherent in the subjects of their legislation may classify those subjects and make laws applicable to one class that are inapplicable to another, but may not make such classifications arbitrarily.

(2) There are three indispensable conditions to a constitutional imposition by a state of liabilities or burdens upon and to a constitutional grant by a state of rights or privileges to the members of a class that other members of the state may not bear or enjoy:

(a) There must be such a difference between the situation and circumstances of all the members of the class and the situation and circumstances of all other members of the state in relation to the subjects of the discriminatory legislation as presents a just, natural reason for the difference made in their liabilities and burdens and in their rights and privileges.

(b) No one who does not belong to the class may be included therein, and all the members of the class must be treated alike.

(c) All who are in a situation and circumstances relative to the subjects of the discriminatory legislation indistinguishable from those of the members of the class must be brought under the influence of the law and treated by it in the same way as are the members of the class.

(3) The employer's liability law of South Dakota fulfills neither of these conditions and is violative of the prohibition of unequal laws contained in the fourteenth amendment because there is no sound reason of necessity or propriety for the difference of liabilities and rights it makes between the masters and servants in the class it forms and other masters and servants in the state in the same situation and circumstances relative to its subject-matter as the members of the class, and because it does not subject to its provisions all masters and servants who are in the same situation and circumstances relative to its subject-matter as the members of the class it forms.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 702; Dec. Dig. §§ 211, 245.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2. CONSTITUTIONAL LAW (§ 48\*)—DETERMINATION OF CONSTITUTIONAL QUESTIONS—CONSTRUCTION OF STATUTES—EMPLOYER'S LIABILITY LAW.**

The employer's liability act of South Dakota, which by its terms subjects every common carrier engaged in commerce in the state to liability for, and grants to every employé of every such carrier a cause of action for, injuries to the employé caused by the negligence of a fellow servant and for those contributed to by his own negligence, may not be limited by construction to a constitutional class, to common carriers using the agency of steam or other powerful agency and operating engines, trains, or other ponderous machinery and their servants engaged in hazardous and dangerous occupations and then sustained.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 46; Dec. Dig. § 48.\*]

**3. STATUTES (§ 64\*)—PARTIAL INVALIDITY.**

Where a part of a statute is constitutional and a part is unconstitutional, the former may be sustained in proper cases, while the latter fails.

Indispensable conditions of such a result, however, are that: (a) The constitutional part and the unconstitutional part are capable of separation so that each part may be read and may stand by itself, (b) the unconstitutional part is not so connected with the general scope of the law as to make it impossible, if it is stricken out, to give effect to the apparent intention of the Legislature in enacting the law, (c) the insertion of words or terms is not necessary to separate the constitutional part from the unconstitutional part and to give effect to the former alone.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 58–66, 195; Dec. Dig. § 64.\*]

**4. CONSTITUTIONAL LAW (§ 70\*)—JUDICIAL LEGISLATION—CONSTRUCTION OF STATUTES—PRESUMPTION FROM GENERAL LANGUAGE.**

Where the Legislature of a state has included in a law by general language numerous subjects or persons and has made no limitation or exception, the legal presumption is that it intended to make none, and it would be judicial legislation for a court to do so.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 70.\*]

**5. CONSTITUTIONAL LAW (§ 48\*)—EXCEPTIONS TO GENERAL LANGUAGE INADMISSIBLE TO MAKE CLASSIFICATION CONSTITUTIONAL.**

A statute of a state which includes by general language in a single class those within and those without the constitutional class may not be limited by judicial construction to the latter class and then sustained.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 46; Dec. Dig. § 48.\*]

In Error to the Circuit Court of the United States for the District of South Dakota.

Action by Marie M. Westby, administratrix of Martin Westby, against the Chicago, Milwaukee & St. Paul Railway Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

William G. Porter (Charles E. Vrooman, on the brief), for plaintiff in error.

A. B. Kittredge (Hans Urdahl and Edwin R. Winans, on the brief), for defendant in error.

Before SANBORN, Circuit Judge, and RINER and WILLIAM H. MUNGER, District Judges.

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

SANBORN, Circuit Judge.   At about 9 o'clock in the morning on a bright day in December, as Martin Westby, a section foreman, was walking west on the northerly track of the Chicago, Milwaukee & St. Paul Railway Company at Madison, in South Dakota, one of its passenger trains, which was backing from the station in order to change engines, overtook and struck him.   The plaintiff below was the widow and administratrix of his estate, and she brought this action and recovered a judgment for the benefit of herself and their minor children under the employer's liability act of February 20, 1907 (chapter 219 of the Session Laws of South Dakota for 1907), which provides:

"Section 1. That every common carrier engaged in trade or commerce in the state of South Dakota shall be liable to any of its employés, or in the case of his death, to his personal representative for the benefit of his widow and children, if any, if none, then for his parents, if none, then for his next of kin dependent upon him, for all damages which may result from the negligence of any of its officers, agents or employés, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, ways or works.

"Sec. 2. That in all actions hereafter brought against any common carrier to recover damages for personal injuries to an employé, or where such injuries have resulted in his death, the fact that the employé may have been guilty of contributory negligence shall not bar a recovery where his contributory negligence was less than the negligence of the employer, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé.   All questions of negligence and contributory negligence shall be for the jury."

There are many specifications of alleged error in this case which involve grave questions of law; but the face of the record discloses an error which was probably inadvertently made, but from which there seems to be no escape.   It is that the court struck out the testimony of Mr. Miller, a witness for the defendant and the conductor of the train that struck Westby, upon the issue whether or not that train was executing a switching movement when the accident happened.   The materiality and importance of this testimony will appear from a brief statement of the pleadings, the course of the trial, and the charge of the court relative to this issue.

The administratrix alleged in her complaint, among other things, that Mr. Westby was one of the section foremen and yardmasters of the defendant, that he knew its rules, that rule 60 was that "when a train is pushed by an engine, except when switching and making up trains in yards, a trainman must be stationed on the front of the leading car with proper signals so as to perceive the first sign of danger and immediately signal the engineer," that it had always been the custom at Madison to obey this and other rules, that Westby relied upon this rule and the custom of obeying it, and while he was engaged in the discharge of his duty as section foreman the defendant backed the passenger train upon him without any trainman upon the leading car and struck him.   The defendant in its answer denied all negligence on its part, and among other things denied that it had been the custom of its employés at Madison to obey rule 60, and that Mr. Westby relied upon the rule or upon any such custom, and averred that the rule was inapplicable to the train which struck him because it was switch-

ing, and that he was guilty of negligence which directly contributed to his death. These facts were disclosed by the trial. The accident happened in the railroad yard at Madison where there were many railroad tracks. Among these were two called the "Bristol-Madison track" and the "Wessington Springs-Madison track," which extended east and west, parallel to each other and about 14 feet apart from center to center, from a point about 600 feet east of Union avenue to a point several hundred feet west of that avenue. Union avenue crossed these tracks at right angles. One hundred and thirty-three feet west of it and on the north side of the tracks was a toolhouse, and about 1,300 feet east of it was the depot. The Bristol-Madison track was the northerly track, and there was a switch about 600 feet east of Union avenue over which passenger trains coming from the west on the Bristol-Madison track passed on to the Wessington Springs-Madison track to reach the depot.

Two passenger trains going east, one from Bristol on the Bristol-Madison track and one from Wessington Springs on the Wessington Springs-Madison track, were due at Madison about the time of the accident, and the Bristol-Madison train changed engines there. When that train arrived, the Wessington Springs train had not come in, and the Bristol train stopped about 30 feet west of Union avenue, and Westby, who, with two sectionmen, was at work on a switch just south of the Wessington Springs track, talked with some of its crew. The Bristol train then went on across the switch upon the Wessington Springs track and to the station, delivered its passengers and baggage, and then backed up across the switch again onto its own track and across Union avenue in order to change its engine. When it passed over the switch, the conductor and the brakeman got off the rear end of the train to attend to the switch and the train respectively and left no one there. The train backed slowly up along its own track. The Wessington Springs train was then coming in from the west, and as the rear of the Bristol train backed up over Union avenue Westby had left his work just south of the Wessington Springs track, had crossed that track, and was walking along on the Bristol track toward the toolhouse in order to get some plugs. As he walked along this track, the rear of the Bristol train overtook and knocked him down. If there had been a trainman on the rear of the train, it is probable that he would have seen Westby, would have given him a signal, and would have saved him; but there was no one on the rear of the train at the time of the accident. If Mr. Westby had looked to the east along the north track, which was free from all obstructions, either when he went upon it or while he was walking along it, it is probable that he would have seen the train backing towards him, and that he would have saved himself. Testimony was introduced before the jury that the fatal movement of the Bristol train was, and that it was not, a switching movement, and the court instructed the jury that:

"In determining whether the employés in charge of the train were negligent you will consider the evidence of the witnesses as to whether this train movement that resulted in the death of Westby came within rule 60, or whether it was a switching movement so as to exclude it from that."

Mr. Miller, the conductor of the Bristol train, testified upon this issue without objection on Saturday afternoon, April 26, 1909, as follows:

"Q. Take this movement from the time you moved back, gave the signal to move back to change that engine, and to get out of the way of the other train, up to the time you returned to the station again, what was the character of that movement?  A. It would be switching.  We could not call it anything else.

"Q. How many classes of movements are there of trains and cars?  A. Two.

"Q. What are they?  A. One would be switching and the other would be leaving a station.

"Q. What would you call the latter?  A. Road movement.

"Q. Train line movement?  A. Yes, sir.

"Q. Traffic movement?  A. Yes, sir.

"Q. You may state whether or not the movement of cars and trains fall in one or the other of these classes.  A. Yes, it would be either switching or otherwise.

"Q. Either switching or train line movement?  A. Making preparation for completing the train would be switching, putting it together ready for the engine.

"Q. How many switches do you go through to get back to the point where you took off the engine to put on another?  A. Two.

"Q. And in returning how many?  A. The same two."

On the following Monday after Mr. Peterson had testified that he was, and for five years had been, trainmaster of the Iowa & Dakota division of the defendant's railroad, and that the movement of this train was a switching movement, he was asked what he knew "in regard to the custom as to the observance of rule 60 where trains are being switched as to a party being put on the rear car." Thereupon the court sustained the objection of the plaintiff below that the question was incompetent, irrelevant, and immaterial, and granted her motion "that the testimony of the witness Miller given on Saturday afternoon be stricken out because it is incompetent, irrelevant, and immaterial." As the issue whether or not the movement of the train at the time of the accident was switching and was, therefore, excepted from rule 60, was made by the pleadings, tried by the evidence, and was so material that it was submitted to the jury by the court, there is no escape from the conclusion that it was an error of law to withdraw from the jury the testimony of the conductor upon this issue.

Counsel for the plaintiff called attention to the fact that Miller also testified that it was not customary in moving trains backward, as the Bristol train was moved at the time of the accident, to place a trainman or any one on the rear car for the purpose of warning trackmen or sectionmen working around the yards, and they argue that the question to Peterson, which was asked just before the motion to strike out Miller's testimony was made, was directed to this issue, and that it was the portion of Miller's testimony directed to this issue, and that alone, that was stricken out. It may be that in the thought of counsel and court at the time this motion was made this was the purpose and extent of the motion and of the ruling. But the question before us is not now what counsel and court thought about it, but what the motion and the ruling meant to the jury. The pleadings, the evidence, and the charge have been read again in view of the contention of

counsel upon this subject without finding any safe ground for holding either that the jury were told, or that they understood, that the motion granted did not withdraw from their consideration just what it stated, and that was the testimony of "Miller given on Saturday afternoon," and that testimony was all the testimony he gave in the case. When an attempt is made to limit the motion to part of his testimony, the question at once arises to what part, and there is nothing in the record which answers it. Moreover, the question asked Peterson just before the motion was made was not directed, as is the part of Miller's testimony to which this court is asked to limit the motion, to the custom "for the purpose of warning trackmen or sectionmen working around the yards," but it called for the general custom where trains were being switched, as he had testified that this train was, regardless of the purpose of the custom. Our reluctant conclusion is that the record forbids a limitation of this motion, and that the jury must have understood it to mean what counsel said when he made it and that the ruling upon it necessitates another trial of this action.

The court below overruled objections made at the trial of this case and to the charge of the court on the ground that the employer's liability law of South Dakota was unconstitutional. Prior to the act of February 20, 1907, employers in South Dakota were not liable for injuries or deaths of their employés which the latter's negligence contributed to cause nor for those caused by the negligence of their fellow servants, and this is still the general law of that state. That statute of 1907 excepted from this general law, which still governs the rights of all other masters and servants in that state, common carriers and their servants, subjected the former to, and granted to the latter, causes of action for injuries to the servants caused by the negligence of their fellow servants and for injuries to which their own negligence contributed, while no such liabilities were imposed upon other employers and no such rights were granted to other servants. The fourteenth amendment to the Constitution of the United States forbids any state to "deny to any person within its jurisdiction the equal protection of the laws." How may such legislation escape this inhibition? The answer is, by classification, and the concession is freely made that the Legislatures of the states may lawfully classify the subjects of their laws and make provisions applicable to one class of subjects that have no application to another class. But the members of these classes may not be selected arbitrarily without just or sound reason inherent in their respective situations and circumstances relative to the subject-matter of the legislation for the difference in the burdens imposed and the privileges conferred upon them by such a discriminatory law.

In the face of the constitutional prohibition of unequal laws, there are three indispensable conditions to a constitutional imposition of liabilities or burdens upon, or a constitutional grant of rights or privileges to, the members of one class that other members of the state do not bear or enjoy: (1) There must be such a difference between the situation and circumstances of all the members of the class and the situation and circumstances of other members of the state in relation to the subjects of the discriminatory legislation as presents a just and natural

reason of necessity or propriety for the difference made by the law in their liabilities and rights. While reasonable classification is permitted, without doing violence to the equal protection of the laws, such classification must be based upon some real and substantial distinction, bearing a reasonable and just relation to the things in respect to which such classification is imposed; and classification cannot be arbitrarily made without any substantial basis. Arbitrary selection, it has been said, cannot be justified by calling it classification. Gulf, Colorado & Santa Fé Ry. Co. v. Ellis, 165 U. S. 150, 155, 165, 17 Sup. Ct. 255, 41 L. Ed. 666; Cotting v. Kansas City Stock Yards Co., 183 U. S. 79, 107–112, 22 Sup. Ct. 30, 46 L. Ed. 92; Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 559, 22 Sup. Ct. 431, 46 L. Ed. 679; Southern Ry. Co. v. Greene, 216 U. S. 400, 30 Sup. Ct. 287, 54 L. Ed. —— (filed February 21, 1910); Nichols v. Walter, 37 Minn. 264, 33 N. W. 800; Lavallee v. St. Paul, Minneapolis & Manitoba Ry. Co., 40 Minn. 249, 252, 41 N. W. 974; State v. Loomis, 115 Mo. 307, 314, 22 S. W. 350, 21 L. R. A. 789; Ballard v. Mississippi Cotton Oil Co., 81 Miss. 507, 34 South. 533, 549, 62 L. R. A. 407, 95 Am. St. Rep. 476. (2) No person who does not belong to the class may be included therein, and all persons within the influence of the legislation relative to the class must be treated alike thereby. (3) All who are in a situation and circumstances relative to the subject of the discriminatory legislation indistinguishable from the situation and circumstances of the members of the class must be brought under the influence of the legislation and treated by it in the same way as are the members of the class.

"An act of class legislation to stand in the face of the Constitution must include all who belong to the class—not all who bear similarity in some characteristics to those included, but all who cannot be distinguished from them in that particular characteristic which justifies the act. And it must include none who do not belong to the class." Sams v. St. Louis & M. R. Co., 174 Mo. 53, 73 S. W. 686, 691, 61 L. R. A. 475; Johnson v. St. Paul & Duluth R. Co., 43 Minn. 222, 224, 45 N. W. 156, 8 L. R. A. 419; Lodi Township v. State, 51 N. J. Law, 402, 18 Atl. 749, 6 L. R. A. 56.

It is evident from a casual reading of the three conditions which have been stated that, if either of them be disregarded, parties within or without the legislative class must be deprived of the equal protection of the laws, and the question at once arises: Does this statute of South Dakota comply with these conditions?

The subject-matter of the statute is the liability of masters for injuries to their servants caused by the negligence of their fellow servants and for those to which their own negligence contributes. There is a sound and natural reason why railroad companies should be liable, while other employers are not, for the injuries of their servants engaged in the operation of their engines and trains and in the construction and repair of tracks and roadbeds on which engines and trains are in operation and in any other like hazardous occupations, although those injuries are incurred by the negligence of fellow servants. It is that the occupation of these servants is more hazardous and more dangerous than that of servants in ordinary occupations, and that the fellow servants on whose care their safety largely depends are so numerous and many of them are so distant from them in place or in

work that they have little, if any, opportunity to learn their characters for care and prudence. If the act under consideration limited its beneficiaries to servants of this class, it might escape the ban of the Constitution and be sustained. But it confers its causes of action upon all the servants of all common carriers, whether these servants are engaged in dangerous or in comparatively safe occupations, whether they are driving engines, operating trains, and repairing railroad tracks, or making tariffs, keeping books, trying lawsuits, conducting or driving street cars, or stagecoaches, or cabs, or omnibuses, or wagons, loading and unloading drays or trucks, or operating a telegraph or a telephone or an express business, so that the danger of their occupations utterly fails to distinguish their situation and circumstances from those of the servants of other masters some of whom, like the servants in this legislative class, have dangerous and others comparatively safe occupations.

All who pursue the business of carrying passengers or goods or information for hire for the public generally, railroad companies, express companies, telegraph companies, telephone companies, street car companies, owners and operators of omnibuses, cabs, carriages, carts, drays, trucks, sleds, boats, and many other vehicles, are common carriers. Hutchinson on Carriers (2d Ed.) §§ 58–69; Employers' Liability Cases, 207 U. S. 463, 497, 28 Sup. Ct. 141, 52 L. Ed. 297. A little reflection upon the vast amount of transportation conducted by common carriers in taking passengers and goods to and from railroads and vessels and in carrying them through parts of the country which the railroads do not reach makes the fact apparent that railroad companies constitute but a small percentage of the number of common carriers, and convinces that a large proportion and probably a large majority of all the servants of all common carriers are not engaged in any dangerous occupation whatever. Under this statute, if a bookkeeper or any other servant of a common carrier who is engaged in the performance of clerical duties in its general offices, and such a servant of a merchant or manufacturer engaged in the same occupation under the same circumstances, are each injured by the negligence of a fellow servant, the common carrier is liable for the damages his servant sustained, while the merchant or manufacturer is exempt from any liability for the damages which his employé suffered. A girl working for a telephone company may recover from it the damages she sustains through the negligence of her fellow servant which her own negligence contributed to cause; but a girl operating a telephone for a hotel keeper or a merchant and discharging the same duties under the same circumstances has no remedy for her injuries. A common carrier is liable for the injuries of his servant engaged in loading, unloading, or driving a dray, a wagon, or a truck caused by the negligence of his fellow servant; but a merchant or a manufacturer, or any other person, is exempt from liability for such injuries to his servants engaged in doing the same work under the same circumstances. A telegraph operator employed by a telegraph company may recover of his master for injuries caused by the negligence of his fellow servant which his own negligence contributed to cause; but a telegraph oper-

ator employed by a bank or a commission company to discharge the same duties under the same circumstances can recover nothing for such injuries.

Illustrations might be multiplied indefinitely; but these seem to be ample to show that this statute denies the equal protection of the law to persons in the same situations and circumstances relative to the subject-matter of this legislation. There is no reason of necessity or propriety—there is no reason whatever that occurs to us—why a common carrier should be subjected to liability to his bookkeeper or to his clerk in his general offices, or to his driver or loader of his dray or truck or to any other of his servants who is not actually engaged in some such hazardous occupation as operating engines or trains, or handling or working about machinery, while the merchant, the manufacturer, and all other persons are exempt from such liabilities to their servants engaged in the performance of the same work under the same circumstances. And there is no just reason—nay there is no reason whatever that we can ascertain—why such servants of common carriers who are not engaged in any dangerous or hazardous occupation should be granted the right and privilege of recoveries from their masters for damages caused by the negligence of their fellow servants which their own negligence contributed to cause while the servants of other persons doing the same work in the same situation and circumstances are denied this right and privilege. The discrimination which this statute works violates the indispensable conditions of a constitutional classification. There is no difference between the situation and circumstances of all the members of the class which the statute forms and those of all other masters and servants in the state relative to the subject-matter of this legislation that presents any natural or sound or just reason of necessity or propriety for the difference in their liabilities and rights it attempts to make, and it does not bring under its influence all masters and servants who are in a situation and in circumstances relative to its subject-matter indistinguishable from those of members of the class. All employés of those who are not common carriers who are engaged under similar circumstances in the same or similar occupations to those of the employés of common carriers that are not engaged in dangerous occupations are entitled to the same rights of action and to the same privileges that are granted to such servants of common carriers, and the denial of them by this statute is a denial of the equal protection of the laws. And all common carriers are entitled to the same exemptions from liability to their employés who are not engaged in any dangerous occupation for injuries caused by the negligence of their fellow servants which their own negligence contributed to cause that other employers enjoy. The statute deprives them of this exemption and thereby denies to them the equal protection of the laws. Because there is no sound reason of necessity or propriety for the difference of liabilities and rights which this law makes between the members of the class it forms and the other masters and servants in the state in the same situation and circumstances as members of the class, and because it does not include and subject to its provisions all masters and servants in the state who are in the

same situation and circumstances relative to the subject-matter of the legislation as are members of the class it forms, the conclusion has been irresistibly forced upon our minds that this statute denies to many citizens the equal protection of the laws and violates the fourteenth amendment to the Constitution.

Perhaps the most learned and exhaustive opinion upon this question is that of Chief Justice Whitfield in Ballard v. Mississippi Cotton Oil Co., 81 Miss. 507, 34 South. 533, 62 L. R. A. 407, 95 Am. St. Rep. 476. Support for the conclusion which has been reached may be found in that opinion and in Gulf, Colorado & Santa Fé Ry. Co. v. Ellis, 165 U. S. 150, 155, 165, 17 Sup. Ct. 255, 41 L. Ed. 666; Cotting v. Kansas City Stock Yards Co., 183 U. S. 79, 107–112, 22 Sup. Ct. 30, 46 L. Ed. 92; Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 559, 560, 22 Sup. Ct. 431, 46 L. Ed. 679; Southern Ry. Co. v. Greene, 216 U. S. 400, 30 Sup. Ct. 287, 54 L. Ed. ——, filed February 21, 1910; Lavallee v. St. Paul, Minneapolis & Manitoba Ry. Co., 40 Minn. 249, 251, 41 N. W. 974; Indianapolis Traction & Terminal Co. v. Kinney, 171 Ind. 612, 85 N. E. 954, 956, 957, 23 L. R. A. (N. S.) 711; Bedford Quarries Co. v. Bough, 168 Ind. 671, 674, 80 N. E. 529, 533, 14 L. R. A. (N. S.) 418; Sams v. St. Louis & M. R. Co., 174 Mo. 53, 73 S. W. 686, 689, 691, 61 L. R. A. 475; State v. Loomis, 115 Mo. 307, 314, 22 S. W. 350, 21 L. R. A. 789; Johnson v. St. Paul & Duluth R. R. Co., 43 Minn. 222, 223, 45 N. W. 156, 8 L. R. A. 419; Indianapolis Union Ry. Co. v. Houlihan, 157 Ind. 494, 60 N. E. 943, 945, 946, 54 L. R. A. 787; Deppe v. Chicago, Rock Island & Pacific Ry. Co., 36 Iowa, 52; Missouri Pacific Ry. Co. v. Haley, 25 Kan. 26, 35; Union Pacific Ry. Co. v. Harris, 33 Kan. 416, 6 Pac. 571. Counsel for the defendant in error have called attention to, and we have considered, the facts that the national employer's liability act of June 11, 1906 (34 Stat. 232, c. 3073 [U. S. Comp. St. Supp. 1907, pp. 891, 892, Supp. 1909, p. 1148]), creates a class that includes every common carrier engaged in commerce among the states and in the territories and in the District of Columbia, that it was sustained so far as it related to the territories and the District of Columbia in El Paso & N. E. Ry. Co. v. Gutierrez, 215 U. S. 87, 30 Sup. Ct. 21, 54 L. Ed. ——, and that in Employers' Liability Cases, 207 U. S. 463, 492, 28 Sup. Ct. 141, 52 L. Ed. 297, the Supreme Court dismissed the criticism that this law placed all common carriers in a disfavored and all its employés in a favored class with the remark that this consideration concerned the expediency of the act, not the power of Congress to enact it. But the prohibition of the fourteenth amendment was not directed against and did not limit or affect the power of Congress. Its command is "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, * * * nor deny to any person within its jurisdiction the equal protection of the laws," and the cases in which the national employer's liability acts have been considered involved and hence decided no question of the violation of that amendment. It is, however, significant that when the Congress came to pass Act April 22, 1908, c. 149, 35 Stat. 65 (U. S. Comp. St. Supp. 1909, p. 1171), in lieu of that of 1906, which had

been held unconstitutional so far as it related to commerce among the states, it restricted the class formed by that act to "every common carrier by railroad" engaging in interstate or other specified commerce and their employés.  In the cases of Missouri Pacific Railway Co. v. Mackey, 127 U. S. 205, 210, 8 Sup. Ct. 1161, 32 L. Ed. 107, and Missouri Pacific Railway Co. v. Castle, 97 C. C. A. 124, 172 Fed. 841, cited by counsel for the plaintiff in error, the statutes under consideration limited the classes they formed to railway companies and their employés and did not attempt to include in them all common carriers and their servants, the remark of Mr. Justice Field in the former case that it was "simply a question of legislative discretion whether the same liabilities should be applied to carriers by canal and stage coaches and to persons and to corporations using steam in manufactories" was obiter dictum, is not broad enough in its terms to cover all common carriers and is not in accord with the later considered decisions of the Supreme Court in the Ellis' Case, 165 U. S. 150, 165, 17 Sup. Ct. 255, 41 L. Ed. 666, and the Greene Case, 216 U. S. 400, 30 Sup. Ct. 287, 54 L. Ed. —— (filed February 21, 1910), that:

"It is apparent that the mere fact of classification is not sufficient to relieve a statute from the reach of the equality clause of the fourteenth amendment, and that in all cases it must appear not only that a classification has been made, but also that it is one based upon some reasonable ground—some difference which bears a just and proper relation to the attempted classification—and is not a mere arbitrary selection."

The most searching investigation and deliberate reflection have disclosed no such reasonable ground for, no difference between those within and those without, the class formed by this South Dakota statute which bears any just or proper relation to the classification attempted by it, and, tested by this rule of the Supreme Court, it cannot be sustained.

Nor can this statute lawfully be limited by construction either in its terms or in its effect to railroad companies or to common carriers and their employés engaged in dangerous occupations, and be thus brought out from under the ban of the Constitution and sustained.  That if the act had been thus restricted by the Legislature that passed it it might not have been violative of the fourteenth amendment may be conceded, but is not decided.  It is also true that where a statute is constitutional in part and unconstitutional in part, the former part in proper cases may be sustained, while the latter part fails.  But indispensable conditions of such a result are:  (1) That the constitutional part and the unconstitutional part are capable of separation so that each may be read and may stand by itself (Baldwin v. Franks, 120 U. S. 679, 685, 686, 7 Sup. Ct. 656, 763, 30 L. Ed. 766); (2) that the unconstitutional part is not so connected with the general scope of the law as to make it impossible, if it is stricken out, to give effect to the apparent intention of the Legislature in enacting it; and (3) that the insertion of words or terms is not necessary to separate the constitutional part from the unconstitutional part and to give effect to the former only.  Allen v. Louisiana, 103 U. S. 80, 84, 26 L. Ed. 318; United States v. Reese, 92 U. S. 214, 218, 221, 23 L. Ed. 563; The Trade-Mark Cases, 100 U. S. 82, 99, 25 L. Ed. 550; United States v. Harris,

106 U. S. 629, 641, 642, 1 Sup. Ct. 601, 27 L. Ed. 290; Virginia Coupon Cases (Poindexter v. Greenhow) 114 U. S. 270, 305, 5 Sup. Ct. 903, 962, 29 L. Ed. 185; Spraigue v. Thompson, 118 U. S. 90, 94, 6 Sup. Ct. 988, 30 L. Ed. 115; Income Tax Cases (Pollock v. Farmers' Loan & Trust Co.) 158 U. S. 601, 636, 15 Sup. Ct. 912, 39 L. Ed. 1108; Cella Commission Co. v. Bohlinger, 78 C. C. A. 467, 471, 147 Fed. 419, 423, 8 L. R. A. (N. S.) 537; Ballard v. Mississippi Cotton Oil Co., 81 Miss. 507, 34 South. 554, 555, 62 L. R. A. 407, 95 Am. St. Rep. 476.

In United States v. Reese, 92 U. S. 214, 218, 221, 23 L. Ed. 563, Congress had enacted a law which prescribed punishment for the unlawful refusal to accept votes from all voters while its constitutional power was limited to prescribing the penalty for refusing to receive votes "on account of the race, color, or previous condition of servitude of the voter." The contention of the government was that the act was constitutional as to all refusals to receive votes on account of the race, color, etc., of the voter, and that it could be sustained to this extent and permitted to fail in other cases, because the two classes of cases and the two portions of the act applicable to them were readily separable. But the argument failed. The Supreme Court said:

"We are therefore directly called upon to decide whether a penal statute, which is in general language broad enough to cover wrongful acts without as well as within the constitutional jurisdiction, can be limited by judicial construction so as to make it operate only on that which Congress may rightfully prohibit and punish. For this purpose, we must take these sections of the statute as they are. We are not able to reject a part which is unconstitutional, and retain the remainder, because it is not possible to separate that which is unconstitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not now there. Each of the sections must stand as a whole or fall altogether. The language is plain. There is no room for construction, unless it be as to the effect of the Constitution. The question, then, to be determined, is whether we can introduce words of limitation into a penal statute so as to make it specific, when, as expressed, it is general only."

In Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550, Congress possessed the constitutional authority to protect trade-marks in interstate and foreign commerce, and it enacted a statute which by its terms protected trade-marks in all commerce. The court was urged to restrict this law by construction to trade-marks in interstate and foreign commerce and to sustain it. But it cited and quoted from the opinion in the Reese Case, and held the act unconstitutional.

In Virginia Coupon Cases (Poindexter v. Greenhow, 114 U. S. 270, 5 Sup. Ct. 903, 962, 29 L. Ed. 185, the same argument was again met and overthrown with this declaration, which was subsequently quoted and affirmed in Income Tax Cases (Pollock v. Farmers' Loan & Trust Co.) 158 U. S., at page 636, 15 Sup. Ct., at page 920 (39 L. Ed. 1108):

"It is undoubtedly true that there may be cases where one part of a statute may be enforced as constitutional, and another be declared inoperative and void, because unconstitutional; but these are cases where the parts are so distinctly separable that each can stand alone, and where the court is able to see and to declare that the intention of the Legislature was that the part pronounced valid should be enforceable, even though the other part should fail. To hold otherwise would be to substitute for the law intended by the Legislature one they may never have been willing by itself to enact."

In Spraigue v. Thompson, 118 U. S. 90, 94, 6 Sup. Ct. 988, 30 L. Ed. 115, the Legislature of Georgia had enacted a statute which would have been valid if it had not contained certain unconstitutional exceptions. The Supreme Court of that state sustained it upon the ground that the body of the act was readily separable from the exceptions. The Supreme Court reversed that decision and said:

"It was held, however, by the Supreme Court of Georgia, in the case now before us, that so much of the section as makes these illegal exceptions may be disregarded, so that the rest of the section as thus read may stand, upon the principle that a separable part of a statute, which is unconstitutional, may be rejected, and the remainder preserved and enforced. But the insuperable difficulty with the application of that principle of construction to the present instance is that by rejecting the exceptions intended by the Legislature of Georgia the statute is made to enact what confessedly the Legislature never meant. It confers upon the statute a positive operation beyond the legislative intent, and beyond what any one can say it would have enacted in view of the illegality of the exceptions."

The act of the Legislature of South Dakota expressly includes within the same general term "every common carrier engaged in trade or commerce in the state of South Dakota shall be liable to any of its employés, or in case of his death to his personal representative," carriers and employés in the constitutional and those in the unconstitutional class, those engaged in hazardous and dangerous, and those employed in comparatively safe occupations. The part of the statute applicable to the former class cannot be separated from that applicable to the latter class, so that each may be read and may stand by itself, because both classes are embodied in the general words "every common carrier" and "any employé" and are included in a single declaration. The unconstitutional part cannot be eliminated from the law by striking out or disregarding any words or clauses of the act. That result can be attained only by introducing into the statute words of limitation which would expressly restrict the general terms "every common carrier" and "any employé" to common carriers using dangerous power and machinery and their employés engaged in dangerous occupations about them, a species of legislation the courts are without the power to enact. United States v. Reese, 92 U. S. 221, 23 L. Ed. 563. Such a limitation would exclude from the operation of the act far the larger number of the employers now within it and a large portion, probably a majority, of the employés within it, and it is far from plain that, if it was the intention of the Legislature that the law should have this effect, the legislators would have enacted it with such a limitation. Indeed, the fact that they made no such limitation, and that they excepted none of the unconstitutional classes from the broad terms of the law, raises a conclusive legal presumption that they intended to make no such limitation or exception, and it would be judicial legislation for the courts to do so. Cella Commission Co. v. Bohlinger, 78 C. C. A. 467, 473, 147 Fed. 419, 425, 8 L. R. A. (N. S.) 537; Omaha Water Co. v. City of Omaha, 77 C. C. A. 267, 147 Fed. 1, 12 L. R. A. (N. S.) 736; Madden v. Lancaster County, 12 C. C. A. 566, 572, 65 Fed. 188, 194; Wrightman v. Boone County, 31 C. C. A. 570, 572, 88 Fed. 435, 437; Union Central Life Ins. Co. v. Champlin, 54 C.

C. A. 208, 210, 116 Fed. 858, 860. The statute cannot be restricted lawfully by construction to the constitutional class because the part applicable to that class is not separable from the part applicable to the unconstitutional class so that each may be read and may stand by itself, because it is not apparent that the Legislature would have passed the act if it had been limited to the constitutional class, because the Legislature excepted neither class, and the legal presumption is that it intended to except none, and because the statute cannot be restricted to the constitutional class by the elimination of words or clauses; but this result can be attained only by the introduction into it of express words or terms.

There are other questions of law urged upon our attention in this case; but, as they may not arise in another trial, no useful purpose would be served by discussing and deciding them now, for sufficient has been said and decided to determine the validity of the present judgment and to indicate the general course of proceedings hereafter, and the judgment is, accordingly, reversed, and the case is remanded to the court below with directions to grant a new trial.